**NATIONAL LABOR RELATIONS BOARD v. REMINGTON RAND, Inc. (CENTRAL EXECUTIVE COUNCIL OF REMINGTON RAND EMPLOYEES' ASS'NS, Intervener).**

No. 153.

Circuit Court of Appeals, Second Circuit.

Feb. 14, 1938.

Charles Fahy, of Washington, D. C., Robert B. Watts, Philip Levy, and H. Gardner Ingraham, all of Washington, D. C., for the National Labor Relations Board.

Bond, Schoeneck & King, of Syracuse, N. Y. (George H. Bond and Tracy H. Ferguson, both of Syracuse, N. Y., and John A. W. Simson, of Buffalo, N. Y., of counsel), for Remington Rand, Inc.

Bernard A. Kosicki, of Hartford, Conn., and John Holley Clark, Jr., of New York City, for intervener.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge.

This case arises upon a petition filed by the National Labor Relations Board under section 10(e) of the National Labor Relations Act, 29 U.S.C.A. § 160(e), for an order of this court to enforce the Board's order, passed on March 13th, 1937, in a proceeding before it against the respondent, Remington Rand, Inc. This was begun upon a charge, filed with the Board by the Remington Rand Joint Protective Board of the District Council Office Equipment Workers, on which the Board filed a complaint, alleging that the respondent was engaging in "unfair labor practices." The respondent answered, and a trial examiner was appointed who conducted hearings during November and December, 1936. The respondent appeared at these hearings, cross-examined the witnesses, but put in no evidence of its own except a few exhibits. The decision on which the order was issued is extremely voluminous, covering more than 200 pages of the printed record; it is rather in the nature of a discursive opinion than of specific findings of fact, but it ends with certain conclusions of law followed by the order, a copy of which is annexed at the end hereof. A summary of the more important facts stated in the decision is as follows. The respondent, a Delaware corporation, manufactures typewriters and general office equipment, and has a great number of plants scattered all over the world; it is engaged in interstate commerce. This controversy concerns six of its plants, i. e. those at Tonawanda, Ilion and Syracuse, in New York, at Middletown, in Connecticut, and at Marietta and Norwood, in Ohio. (At Tonawanda there are strictly speaking two plants, one at Tonawanda, and the other at North Tonawanda, and these have been treated as one.) A number of the maintenance and equipment workers in each of these plants had by 1934 organized into one or more local unions; in Ilion there were five, at Syracuse three, Middletown four, at Norwood five and at Marietta and Tonawanda one each. These locals were affiliated with general craft unions under the direction of the District Council of Office Equip-

ment Workers, which the Metal Trades Department of the American Federation of Labor chartered in March, 1934; the Council was made up for the most part of workmen in the six plants, and was superseded in February 1936 by the complainant here, Remington Rand Joint Protective Board, which we shall speak of as the Joint Board. The Labor Board has found that this body represented a majority of the employees in the six plants, which together constituted an appropriate bargaining unit under section 9(b) of the Act, 29 U.S.C.A. §159(b).

The controversy dates back to the autumn of 1935 and had its origin in rumors and newspaper articles that the respondent was about to set up a plant at Elmira, N. Y., and dismantle corresponding producing units elsewhere. It had developed a new typewriter—"Madame X"; had bought the plant of the Elmira Precision Tool Company; and began shipping machinery thither early in 1936. The Joint Board first wrote the respondent upon the subject on January 11, 1936, speaking of information which they had received about the new project, and asking for a conference. Ross, the plant manager at Ilion, met them later in that month and declared in a written statement that the respondent had no intention of manufacturing in Elmira, which must have been deliberately false. This did not satisfy the Joint Board, who after some correspondence secured a second conference, this time with Anderson, manager of the Cincinnati plant, on April 24th and 25th, at which they insisted that it would be a breach of an agreement made with the union in 1934 for the respondent to farm out any part of its production to the Precision Tool Company at Elmira. Anderson professed ignorance of the Elmira project, though he let out—in curious contradiction—that the respondent planned to move the Norwood plant to that place. A wage increase was also demanded, which Anderson refused, and thereupon the conference broke down. The Joint Board had asked to confer either with James H. Rand, Jr., the respondent's president, or with Benner, a vice-president; but although Benner had at first agreed to see them, he did not appear. Annoyed by this failure to meet any higher official, and at the refusal of the wage increase, and concerned over the proposed change to Elmira, they decided to take a strike vote of the locals in all six plants. The ballot

authorized them to call a strike for the three reasons just mentioned, and the vote, which was taken by locals, resulted in a total of 3768 votes, out of which 3200 were for a strike. This result being known on May 10th, the Joint Board wrote to Rand personally, saying that the results of the conference with Anderson had been most unsatisfactory, and asking for a personal conference to go over the matters with which he had not had authority to deal. Rand did not answer; and on the 21st the respondent announced that it would take a strike vote of its own in the six plants, which it proceeded to do on that day. At Tonawanda, Ilion and Syracuse, members of the Joint Board, or other union officials, actively interfered with the taking of this vote; at Tonawanda a committee complained to Hart, the plant manager, and when he would not stop the ballot, told the men not to vote; at Ilion, one, Beer, a member of the joint Board, went through the whole factory, dissuading them; at Syracuse the union leaders stopped all work and the vote as well, whereupon the manager closed the plant for two weeks. What happened at the other three plants does not appear; nor have we the complete vote, if indeed there was one. All we know is, that at Ilion there were 70 votes in favor of a strike, 911 against it, and 637 blanks, out of a total of about 2000. The figures at Tonawanda are not given. On the 22d the respondent discharged seventeen men at Syracuse by identical letters which gave no reason for so doing; all but two of these were union officials, and several had been active in interfering with the vote. One employee was discharged at Tonawanda; he too was a union official. In accordance with the authority given them by their own strike vote, the Joint Board thereupon called a strike on the 23d to take effect on Tuesday, the 26th, and the men went out in all the plants on that day.

It had been apparent for some days that a strike was probable or inevitable, and Rand made several public statements on the subject. On May 19th he had an interview in New York with one, Allen, a merchant of Ilion, and Boote, an employee, who afterwards became the leader of a "back-to-work association"; Rand said to them in substance that he would have no further dealings with the American Federation of Labor. On the 21st after discharging the men whom we have mentioned, he told the mayor of Syracuse that

he would not treat with Crofoot, a member of the Joint Board, or any of the other union officials, whom he regarded as "radicals." In Middletown the respondent published a news advertisement which contained a statement that the union represented a minority of the men, and that there would be no use in dealing with it any further. After the strike was on, various offers of mediation were made, one by the Commissioner of the New York State Department of Labor; Rand's secretary answered that the Syracuse conference with Anderson had been unavailing, and refused any further negotiation. The Connecticut Board of Mediation asked Rand to meet Anderson, the Joint Board member from Middletown; no reply was received. In July Governor Cross tried to arrange a conference between three governors and a union representative, but Rand refused, and declared that never again would the respondent treat with any "outside" union officials. On July 24th, the respondent wired the Associated Press that any rumor was false which said that it would deal with "any union official either labor or otherwise."

■ The strike was vigorously contested on both sides, the respondent engaged the services of well-known ⁀ ⁀-breaking agencies, between wh⁀· strikers the usual collisions mutual recrimination; bu⁀ large part of the Board's ⸜ up of the details of these ⸜ not see their materiality t⸜ ᶜore us. An exception is the⸜ wo company or plant union⸜ ᴐf "back-to-work associations⸜ up at Ilion and Middletow⸜ tion of a similar union at S⸜ not concern us for the order ⸜ clude it. These two unions a⸜ existence; their common repr⸜ ·ᴄ has intervened in this court, but ⸜ ᴐ justiciable issue arises about them except over Section I(b) and Section II(a) of the Board's order, which enjoin the respondent from "dominating or interfering with" any labor union, or "contributing" to its support, and require it not to recognize, but on the contrary to "disestablish," the two unions. ⸜ This presupposes that the respondent took a hand in fostering their creation; the evidence is purely inferential. The only reasons to infer that the respondent had any hand in creating the union at Ilion, aside from the fact that it must in general have approved of

it as likely to break the strike, are the following. It does not appear who paid the rent of the "back-to-work association," or the expenses to and from New York of Boote and the four other employees on May 19th. Before the men went back, a meeting was arranged to be held at the plant, to which Boote issued cards of admission; Rand addressed this meeting. So far as appears, that was his only connection with the original association or the resulting union, unless it can be inferred from his paying a guard to protect Boote from violence. The Board's counsel did indeed also try to show that the constitution of the union had been distributed in the shops by foremen, but the evidence was such tenuous hearsay that the examiner indicated his unwillingness to rest upon it, a scruple which we share. Indeed, if such gossamers are to count at all, the opinion of a reporter from a Utica newspaper was that Boote's union was independent of the respondent. The expenses involved in a trip of five men to New York and back and the lease of an office, are too small to justify the conclusion that the respondent must have paid them; nor does the cumulative effect of a single advertisement in the local newspaper add enough. While, therefore, it is possible, and perhaps likely, that the respondent had a hand in the creation of this union, the conclusion is too speculative.

As to Middletown the leader in the "back-to-work association" was also an employee, Frizzell; out of it emerged that union also. This association was of the same type except that the local citizens' committee would not deal with Frizzell; and that, instead of one, there were a number of advertisements published in a newspaper. That the respondent must have paid for these seems to us a gratuitous assumption; again, there is no reason to suppose that such an expense was beyond the pocket of the employees themselves.

■ The only other evidence is that when Frizzell wished application blanks for membership in the "association" a lawyer named Ellis, prepared them, and that Ellis tried to get permission from the mayor of the city to use a room in the city hall for taking in members. This would be neutral enough in itself; but when the respondent asked the court for an injunction against the strikers, it retained Ellis, and at the hearing before the ex-

aminer in the proceeding before the Board he was introduced as the company's attorney. The respondent had it within its power to show what was its connection with Ellis; its silence in the face of his assistance to the union is significant; and we think that there was some evidence to support the finding that the respondent fostered the Middletown union.

The strike proved unsuccessful and was over before the end of the year. Before it ended the respondent had abandoned and dismantled the Norwood plant; at Middletown production had been reduced, as well as at Syracuse; on the other hand at Ilion it was increased. The Elmira plant was put into production, and by the end of September the aggregate number of employees at that and the five old plants was as great as it had been on May 26th. There can be no doubt that the Joint Board had represented a majority of the employees in the original six plants, though exact figures are not obtainable. It will be recalled that 3768 men voted on the ballot of May 10, and the highest figures given for all production and maintenance workers was 6640. The union membership was certainly larger than the vote; the Board estimated it at 5300, and on May 23d the Joint Board claimed 4490 paid up members. The respondent's business was clearly interstate; the evidence showed a large preponderance of interstate over intrastate rail shipments, and, while the trucking statistics were not included, the chances are very small that they would have very much changed the result. For example, the outgoing interstate rail shipments at none of the plants fell below ninety per cent, and in the only case where trucking was included—Middletown—the difference caused by it was only four per cent. If the respondent had really wished to challenge this feature of the case, the evidence was in its own hands.

Such are the facts, and such was the situation, with which the Board had to deal. It will be simplest to consider each provision of the order separately by the number which it bears; there are four injunctions and six grants of affirmative relief.

Section I(a) enjoins the respondent from interfering with the rights of its employees to bargain collectively; it is drawn after section 8(1) of the act, 29 U.S.C.A. § 158(1) with section 7, 29 U.S. C.A. § 157, incorporated; and it adds nothing—being as general as the statute—to its command; it would on its face appear therefore to be unimportant. But this is not true, because contempt will lie for disobedience of our decree, and in accordance with the usual course of equity we should not pass it, unless it has a basis in past conduct of the kind forbidden. The Board was certainly free to find that the respondent had been guilty of "unfair labor practices," for it obviously meant not to confer with the Joint Board after the meeting with Anderson on April 24th and 25th. Rand's declarations alone would be enough; he invited a test of the necessity of treating with the union at all, and consistently followed that course thereafter. The respondent answers that it had no official or conclusive information that the Joint Board was the duly accredited bargaining representative of the men, and that it could not have had until the Labor Board had itself so decided. The Labor Board does indeed have that power, section 9(c), 29 U.S.C.A. § 159(c), and when there is a real doubt, we may assume arguendo that the employer need not decide the issue at his peril; faced by two sets of putative representatives, each claiming to be the properly accredited one, it would seem fairly plain that he need not choose at his peril, especially if he is not allowed to take a vote himself. The same is equally true, though only one set makes the claim; he may be in genuine doubt how many it represents. If he cannot satisfy himself of their credentials, and if he cannot by informal appeal to the Labor Board invoke its power, it would certainly seem that he should be free not to recognize either; but from that immunity it does not in the least follow that he need be satisfied with no evidence except the Board's certificate; it may be entirely apparent from other sources that one set really represents the majority. In the case at bar even though the respondent were in doubt as to the Joint Board's authority, that doubt did not excuse it; for it is quite plain that its position was not based upon any doubt, but upon its unwillingness to treat with "outside" representatives of its employees; that is to say, to recognize the solidarity of the craft as such. The greater included the less, and having taken that position, it may not now say that it could not know whether the Joint Board was properly accredited. Had that been the real reason for its refusal, presumably

it would have been persuaded by the evidence which the Joint Board could have presented. It made no effort to learn the facts and took the chance of what they might be.

■ If, therefore, a refusal to deal with employees collectively is within section 8(1), 29 U.S.C.A. § 158(1), Section I(a) of the Board's order is right. The question is not of great importance for section 8(5), 29 U.S.C.A. § 158(5) covers the situation anyway, but we think that strictly a refusal to negotiate is not within section 8(1), 29 U.S.C.A. § 158(1). The fact that the opposite interpretation would result in an overlap is not indeed conclusive, though redundancy should not be gratuitously ascribed to Congress; but a refusal to negotiate with one's employees does not properly "interfere with," "restrain" or "coerce" their right to "bargain collectively." Those words cover affirmative conduct; refusal to bargain is negative and was apparently left to section 8(5), 29 U.S.C.A. § 158(5). Section I(a) of the order was, nevertheless, valid, because the respondent did "interfere with" rights secured by section 7, 29 U.S.C.A. § 157 when it discharged twenty-eight of its employees for their union activity; that was probably the primary wrong against which section 8(1), 29 U.S.C.A. § 158(1) was directed. (We shall consider the evidence as to these discharges more in detail when we come to the reinstatement provisions.)

■ Section I(b) of the order enjoins "dominating or interfering with * * * any labor organization of its employees, or contributing financial or other support thereto." "Any labor organization" includes the Joint Board, and the discharges just mentioned support the injunction so far, although apparently it was primarily directed against the respondent's continuing to foster the company unions at Ilion and Middletown. But it never contributed money or any other "support" to the Joint Board, and to sustain that clause it is necessary to find that some help was given to the company unions; help which, if given, will also be a reason for including them within the clause against "dominating" and "interfering with" any unions. From our earlier discussion of the facts as to these unions it has already appeared that the respondent's connection with the Ilion union is too shadowy to support an injunction, but that there was some warrant for saying that it had intervened at Middle-

town. One instance is enough to justify an injunction, which does not specifically comprise both company unions. Section I(b) of the order was therefore valid.

■ Section I(c) follows the model of section 8(3) of the act, 29 U.S.C.A. § 158(3), and requires no discussion, since the discharges already mentioned justified it. It is true that in negative form it directs the respondent to restore the discharged men to their jobs, and so far, it ought, as a matter of form, to have been reserved for the restitutive provisions. We shall hope to show later that it was there justified, and we will ignore it for the time being. It may be asked why, since section 8(3), 29 U.S.C.A. § 158(3) specifically covers discharges, the same argument does not apply to the use of them as a basis for an injunction under section 8(1), 29 U.S.C.A. § 158(1), as to a refusal to negotiate; for our interpretation makes both these sections cover the same conduct, and so results in an overlap. But in this instance the language is too peremptory to be avoided; there can be no doubt that discriminatory discharges both "discourage membership in any labor organization," section 8(3), 29 U.S.C.A. § 158(3) and "interfere with * * * employees in the exercise of," section 8(1), 29 U.S.C.A. § 158(1), "the right * * * to form * * * labor organizations," § 7, 29 U.S.C.A. § 157. Both Section I(a) and Section I(c) were therefore valid.

■ Section I(d), insofar as it merely compels the respondent to treat with the Joint Board, is within the language of section 8 (5), 29 U.S.C.A. § 158(5) and was plainly warranted. However, that was nearly two years ago, and it is possible that the Joint Board will no longer represent a majority of the men, even after those who struck are restored to their jobs, as later sections of the order provide. The membership of a union is constantly changing, and it may at any time cease to represent the majority; if it does, it loses its power to bargain for the unit. When the authority of the representatives is in doubt, the Board must inquire and certify under section 9(c), 29 U.S.C.A. § 159(c), that their authority exists, or its order will be without support in the evidence. In the case at bar we could not in any event judge of the Joint Board's continued authority until the old men are reinstated, which the Labor Board has required— lawfully as we shall show later; and even

after that has been done, it will still be impossible to judge, for not only will there have been many changes in personnel, but the men may not be of the same mind. Yet the order in form requires the respondent to recognize the Joint Board indefinitely in the future, and if that really assured them of a perpetual tenure, it would be objectionable for the reasons just given. It does not. Practically, the issue will arise only when there is a new occasion for negotiation, and the Joint Board demands renewed recognition as bargaining agent of the unit. Our order must not then guaranty their power, if it shall appear that they have lost it; but yet it should give them some presumptive authority, for otherwise the act will not be workable. They will be the last representatives; and the respondent must challenge their power for this reason in good faith, and it must invoke an inquiry by the Labor Board under section 9(c), 29 U.S.C.A. § 159(c), if it does not treat with them. But if it does so, we shall not treat its refusal as a contempt, until after the Labor Board has certified the result. It will not be necessary to insert this proviso in the order; it is to be understood as incorporated into it. Section I(d) of the order is valid.

■■■■ Section II(a) requires the respondent to withdraw all recognition from the Ilion and Middletown company unions; so far, it is an inevitable consequence of recognizing the Joint Board as the men's representative; the very purpose of the act is to create a bargaining agent which shall be vested with exclusive power to treat with the employer, and there cannot be two representatives of the same unit. The section concludes, however, with the words: "and completely disestablish those associations as such representatives." This apparently was taken from the order of the district court in Texas & New Orleans Railroad Co. v. Brotherhood of Railway Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034; we cannot see that it adds anything to what precedes, and it certainly did not receive the approval of the Supreme Court; the order was indeed affirmed, but this language was not in question. It appears to us not only redundant, but to carry a charge of disapproval which the act does not warrant. It is to be remembered that the order is to be posted in all the plants, and upon the minds of laymen the addendum is quite likely to impress

an unfair stigma on these unions. Our order will not contain this provision.

■■■■ Section II(b) and (c) reinstate thirty employees discharged as a consequence of their union activities—such is the Board's finding; it is a lawful remedial provision within the powers granted by section 10(c), 29 U.S.C.A. § 160(c). National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 47, 57 S.Ct. 615, 629, 81 L.Ed. 893, 108 A.L.R. 1352. The respondent's defence is that the seventeen at Syracuse were discharged because they had interfered with the taking of the company's strike vote on the 21st; and while there may be some doubt about whether that was the only reason, we will assume that it was, for it did not excuse the discharge. The act set up a system of bargaining which presupposes that the two sides shall meet on equal terms, each using such economic power as it may possess. We need not consider how far an employer may seek to convert his men away from craft to company unions or from unions of all kinds, by means of broadsides, pamphlets, brochures or other means, when that is done openly and above board; whether that is an "interference" with rights created by section 7, 29 U.S.C.A. § 157, is not before us. But it is plain, we think, that after an exclusive bargaining unit has taken a strike vote, it is an active interference with the exercise of its right to "bargain collectively" for the employer to undercut its authority by a vote of his own. The only possible reason for doing this is to show that the union's vote does not truly represent the men's wishes; it is to go over the heads of the representatives to their constituents; to discredit them as representatives, to destroy their power to bargain as such. The members of the Joint Board were therefore within their rights when they sought without violence to prevent this vote from being taken, and the respondent in selecting them for discipline because they did so, was discriminating against them under section 8(3), 29 U.S.C.A. § 158(3).

■■■■ This accounts for six of the men at Syracuse—Bellows, Crofoot, Estey, Witcher, Gallipeau, and Bunnell—and for five others who stopped work themselves, and refused to vote—Slade, Bowen, LaBranche, Dunn and Reyonne. Sickler was apparently discharged because he was at once a foreman and a member of the union. Smith had

protested against the vote to the plant manager, Straub; of the four remaining, three,—Boyle, Palmenter and Lingyak—were officers of the union, and had been active in its affairs; the fourth, McCoy, is more doubtful, for he had apparently never been an officer, though at one time he was a picket. However, he was discharged by the same form of letter as the others, and as he had served satisfactorily for eleven years, it is an almost inevitable conclusion that he was included with them—perhaps, as the Board suggests, by mistake. At Ilion Beer alone was discharged; his activity in trying to stop the company's strike ballot was sufficient ground for singling him out for discipline; he had been a satisfactory workman. Of the twelve discharged at Tonawanda six—Cooper, Lozo, Townsend, Gaul, Todd and Monnier—had been active in opposing the strike vote; Cooper was discharged on May 21st, the others on the 28th; they were all union officers. Of the other five, Dreyer had been a picket and had acted as secretary of the union; there was testimony that the plant superintendent had said that his union activities would cause his discharge. Quenneville had been an officer also; he had been over ten years in the respondent's employ; a finance agent to whom he had applied for a loan, told him after interviewing his immediate boss, Ryan, that he would never be taken back. In all the foregoing instances it was probably possible to reach a different result from the Board; yet there was more than a speculative basis for its findings, and indeed, we might have come to the same conclusion ourselves.

■ The other cases are more doubtful. Kloss, who had worked with the company ten years, had never been an officer, though he had been a picket. He had asked Ryan whether the union approved taking the vote, but it does not appear that he protested. When the strike was over at Tonawanda he came back with a number of others and was the only one to be refused. The evidence is not very cogent, but the respondent gave no explanation of the discharge when it alone could do so; certainly it was a curious circumstance that a man who had so long been employed should have been turned off without a reason. With a little doubt we affirm the order.

■ We cannot do so as to the two women, Demmin and Smith. It is true that Demmin had worked with the respondent for eight years, but after that she had been away for an indefinite period, and had been back for a year; Smith had worked off and on for eight years, and at the time of the strike had been a year at work; so far as appears, she was not even a member of the union. They were both pickets, but all we know about the respondent's failure to reemploy them, is that on asking when they could go back, they were told that "other arrangements had been made" in their cases. They will be entitled to reinstatement under Section II(d), but not under Section II(b) and without back pay under Section II(c).

■ Section II(d) requires the respondent to offer back their old jobs to those who went out on strike in all the plants on May 26th. We may first consider this as though the situation had remained the same; that is, as though the same jobs were still available except for the fact that new men filled them. The intervenor especially protests against the hardship imposed upon its members by this provision; it insists that to turn them out and put in the old men after the strike had been lost, is actively to intervene in an industrial dispute, and not merely to supervise the lists, and compel obedience to the rules, which is all that the act professes to do. It is quite true that Congress did not mean to force the parties to compose their quarrels, but only to treat with each other; yet more may be proper to assure that result than a mere command to accept the union as the bargaining unit in the future. The act expressly preserves the right to strike, section 13, 29 U.S.C.A. § 163, and that includes a strike for refusing to negotiate as well as any other. It is a remedy parallel with recourse to the Labor Board; its use, when unsuccessful, but in a controversy where the men are right, ought not therefore to be prejudicial to them. Moreover—and this is conclusive—the remedy which the act provides expressly includes reinstatement as a part of it. It is of course true that the consequences are harsh to those who have taken the strikers' places; strikes are always harsh; it might have been better to forbid them in quarrels over union recognition. But with that we have nothing to do; as between those who have used a lawful weapon and those whose protection will limit its use, the second must yield;' and indeed, it is probably true today that most men taking jobs so made vacant, realize from the outset how tenuous is their hold.

■ We have assumed hitherto that the strike here in question was only for the purpose of enforcing the union's power to negotiate for all the men. That is not true; there had been a wage dispute, and, the men's inability to get at the truth of the Elmira business was another cause. It is of course possible that the parties might have split over wages, or over the Elmira plant, even if the respondent had negotiated with the Joint Board. But since the refusal was at least one cause of the strike, and was a tort—a "substraction"—it rested upon the tortfeasor to disentangle the consequences for which it was chargeable from those from which it was immune. Since it cannot show that the negotiations, if undertaken, would have broken down, it cannot say that the loss of the men's jobs was due to a controversy which the act does not affect to regulate. There may be cases where an employer can show this; if he can, it would indeed load the scales in an industrial dispute to give back their jobs to the strikers; but the respondent did not try to show that further negotiation would have been fruitless. Section II(d) was therefore proper, so far at least as it applied to all plants but Elmira.

■ The establishment of that plant raises another question of fact: to which of its old employees would the respondent have offered jobs in Elmira had there been no strike? · We are told in motion papers filed after the Board's order passed, that as part of a general settlement it has in fact offered places to the old men at Elmira; but, quite aside from the propriety of considering such evidence in the enforcement proceeding, we cannot hold that one term of a compromise represents the probable action of the respondent, had there been no compromise. Nevertheless, it seems to us certain that some at least of the old employees would have been taken over; seasoned men are better than ·green hands, and we are not to impute to the respondent the unlawful purpose of discriminating against union men. The respondent could indeed have shown that there were good reasons—aside from the effort to rid itself of the union—for not taking some of its workmen to Elmira; but those reasons lay exclusively within its own knowledge. That being true, it is surely reasonable to raise a presumption against it, even though the burden remained upon the Board. For this reason the order was right in including the Elmira plant. There is however one detail which cannot stand; the order not only required the respondent to offer jobs in Elmira to the old men, but to furnish them and their families with transportation, if they should accept. We can find nothing to support the inference that had they not struck, it would have added that inducement, except again that it was part of the compromise, which we cannot use. The requirement stands as a punishment and the powers granted the Board under section 10(c), 29 U.S.C.A. § 160(c) are only remedial; they are designed to enable it to restore the status quo as nearly as possible, had the wrong not been committed; further it may not go. The authorities as to the power to order reinstatement of striking employees are in accord with our views. Jeffery-De Witt Insulator Co. v. National Labor Relations Board, 4 Cir., 91 F.2d 134, 112 A.L.R. 948; National Labor Relations Board v. Carlisle Lumber Co., 9 Cir., 94 F.2d 138, overruling National Labor Relations Board v. Mackay Radio & Telegraph Co., 9 Cir., 92 F.2d 761.

■ Section II(e) requires no further discussion than Section I(d); and Section II(f)—modified to conform to the modifications we have made in the other sections—will stand. There remains only the · defence raised by the respondent that the union has disqualified itself by its own misconduct from appealing to the Board; a carry over from the doctrine of equity that the court will not intervene in favor of one who has been guilty of wrongful conduct in the transaction in question. This defence was overruled in National Labor Relations Board v. Carlisle Lumber Co., supra, 94 F.2d 138, and we agree, although our reasons go beyond the procedural peculiarity that the Board is the petitioner. As we have already said, the act does not attempt to settle industrial disputes; it leaves the parties to the resultant of their opposed economic powers; and while it does force them to treat with each other, it may be assumed to contemplate only bona fide negotiation. Hence it is no doubt true that it does not require further negotiation after it becomes apparent that a settlement is impossible. A union may at times seek to give the appearance of wishing to treat, after it knows that all chance of agreement is gone; in such conflicts each side generally wishes to place the odium of rupture upon the other. For this reason the conduct of a union,· like that of an employer, not

only during the negotiations when there are any, but before there are, may be relevant in ascertaining whether the proposal to confer is genuine, or only part of the tactics of the fight. Nothing else can be material; though the union may have misconducted itself, it has a locus pœnitentiæ; if it offers in good faith to treat, the employer may not refuse because of its past sins. In the case at bar there was no warrant whatever for supposing that further negotiations would have been useless. The respondent had not met with the men except through a subordinate official, and even then, had misstated or concealed the facts about Elmira. Even though the wage increase had been definitely refused and though the issue was closed, the proposed shift to Elmira and especially the equivocation about it remained; they had been the chief causes of the men's anxiety, and they had not been disposed of. That they wished further conferences about these matters cannot be doubted. For these reasons it was unnecessary to go into any past delinquencies of the union.

 Finally, the respondent complains that the examiner did not give it a fair trial; and the intervenor that it had no notice of the proceedings, though its interests were deeply concerned. As to the first, the charges are that the examiner cut short cross-examination; himself took an undue part in the examination; refused a bill of particulars; admitted incompetent, and excluded competent, evidence; used exhibits which had not been admitted in evidence; and in other ways treated it unfairly. We have examined all the instances mentioned in the brief and cannot find anything of consequence. Once or twice cross-examination was stopped, but not, as it seems to us, unduly soon. The examiner was quite within his powers in examining the witnesses himself; a judge often does so. He did indeed admit much that would have been excluded at common law, but the act specifically so provides, section 10(b), 29 U.S.C.A. § 160(b); no doubt, that does not mean that mere rumor will serve to "support" a finding, but hearsay may do so, at least if more is not conveniently available, and if in the end the finding is supported by the kind of evidence on which responsible persons are accustomed to rely in serious affairs. The examiner did deny a bill of particulars, but that could not have seriously prejudiced the respondent. Such a bill is important only when a party must meet his adversary's case without opportunity to prepare; it is of slight value in a trial by hearings at intervals. The notion that its absence really handicapped the respondent in its cross-examination seems to us illusory; and it needed no time to prepare a case for it chose not to put in any. The exhibit admitted after the hearing was closed, was only an abstract of papers presented at the trial of which the respondent had the originals. So far as the conduct of the trial is concerned we cannot therefore see any just grievance. The underlying tone and the style of the decision may not indeed have evinced that judicial detachment which is the surest guarantee of even justice; but the respondent does not apparently complain of that, and our review does not extend to controverted questions of fact.

 As to the failure to give notice to the intervener while the hearings were in progress, section 10(b), 29 U.S.C.A. § 160(b) gives the power to the examiner of the Board to allow intervention, and Rule 19 of the Board expressly includes a "labor organization"; but that is all. Possibly it may not always be adequate relief; other unions may not know of the proceeding while it goes on. Even so, it is an open question whether, the act having dealt with the subject, more can lawfully be required; we need express no opinion as to that, because, although the intervenor at bar alleges that it had no "notice" of the proceeding, we read this as only meaning that the Board did not serve it with process, not that it was ignorant that the proceeding was pending. Moreover, we cannot see that it was substantially prejudiced in any event; its interests were first, that it should not be supplanted as the bargaining unit, and second, that its members should not lose their jobs. We have heard it upon both points, and while in theory it might have persuaded the Board to exercise its discretion otherwise as to Section II(d), that is most unlikely. However, to make assurance doubly sure, we will give it the right, if it wishes, to petition the Board for a change in that clause of the order, by application made within twenty days after this opinion is filed.

 While the present petition was pending, the respondent moved several times for its dismissal on the ground that the controversy had become moot because it had been settled. These motions we denied without

any opinion; our reasons were that while to some extent apparently the strikers have been reinstated, that was by no means the sum of the performance which the Board had required. Moreover, controversies have apparently arisen as to the meaning of the settlement, especially as to whether the new men should be discharged who have taken the strikers' places. It was apparent therefore that we could not dismiss the proceeding as a whole, though it well may be that in some respects the respondent will be found to have already performed what was required of it.

An order will be entered under section 10(e), 29 U.S.C.A. § 160(e), in the same words as the Board's order with the following modifications: (1) strike from Section II(a) the words: "and completely disestablish those associations as such representatives"; (2) strike from Section II(b) the words: "Viola Rose Demmin" and "Blanche Smith"; (3) add at the end of Section II(d): "but the respondent shall not be required to include the transportation expenses of such employees as it may offer to employ at Elmira, New York"; (4) strike out from Section II(f) all that follows the figure "(3)", and substitute: "in the case of the Ilion, N. Y. and Middletown, Conn. plants the respondent will refrain so long as the Joint Board remains the representative for collective bargaining, from any recognition of the Ilion Remington Rand Employees Association and the Middletown Remington Rand Employees Association respectively."

Let the Board submit an order in accordance with the foregoing upon ten days notice to the respondent and the intervenor.

The following is a copy of the Board's order of March 13, 1937.

On the basis of the findings of fact and conclusion of law, and pursuant to section 10, subd. (c) of the National Labor Relations Act, 29 U.S.C.A. § 160(c) the National Labor Relations Board hereby orders that the respondent, Remington Rand, Inc., and its officers and agents, shall:

1. Cease and desist:

(a) From in any manner interfering with, restraining or coercing its employees in the exercise of their rights to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining and other mutual aid or protection;

(b) From dominating or interfering with the formation or administration of any labor organization of its employees or contributing financial or other support thereto;

(c) From discouraging membership in any of the labor organizations affiliated with the Remington Rand Joint Protective Board of the District Council Office Equipment Workers, or any other labor organization of its employees, by discharging and refusing to reinstate employees, or otherwise discriminating in regard to hire or tenure of employment, or by threats of such discrimination;

(d) From refusing to bargain collectively with the Remington Rand Joint Protective Board of the District Council Office Equipment Workers as the exclusive representative of the production and maintenance employees of the respondent employed at its Ilion, N. Y., Tonawanda, N. Y., North Tonawanda, N. Y., Syracuse, N. Y., Elmira, N. Y., Middletown, Conn., Marietta, Ohio plants and at its former Norwood, Ohio plant.

2. Take the following affirmative action which the Board finds will effectuate the policies of the Act:

(a) Withdraw all recognition from the Ilion Remington-Rand Employees' Association and the Middletown Remington-Rand Employes' Association as representatives of its employees at its Ilion and Middletown plants, respectively, for the purpose of dealing with respondent concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work; and completely disestablish those Associations as such representatives;

(b) Offer to Alfred L. Kloss, Ernest Quenneville, Joseph Dreyer, Viola Rose Demmin and Blanche Smith (referred to later as Group A), Harold Beer, Clair Bellows, Vernon Crofoot, Earl LaBranche, Kenneth C. Bunnell, William Dunn, August Lingyak, George Slade, Burton Reyone, George Bowen, Eugene Palmenter, Walter J. Boyle, Alber Galipeau, Alexander Smith, Stephen Estey, Peter Witcher, John Sickler, Edward J. McCoy, David Lozo, Walter O. Gaul, Walter J. Todd, Floyd J. Young, Felix Monnier, William Townsend and Charles Cooper (referred to later as Group B), and each

of them, immediate and full reinstatement, respectively, to their former positions, without prejudice to their seniority or other rights and privileges previously enjoyed;

(c) Make whole the persons named in Paragraph 2(b) above and each of them, for any losses of pay they have suffered by reason of their discharge, by payment to them, respectively, of a sum of money equal to that which each of them would normally have earned as wages during the period, in the case of Group A from the date of discharge to the date of such offer of reinstatement, and in the case of Group B from the date operations in their departments began after the plants had reopened to the date of such offer of reinstatement, and in addition in the case of Cooper from May 21 to May 26, 1936, computed at the weekly wage earned by each on May 26, 1936 less the amounts, if any, which each earned during such period;

(d) Offer reinstatement to all persons who were production and maintenance employees in its Ilion, N. Y., Tonawanda, N. Y., North Tonawanda, N. Y., Syracuse, N. Y., Middletown, Conn., and Marietta, Ohio plants and in its former Norwood, Ohio plant on May 26, 1936 who have not since received regular and substantially equivalent employment elsewhere. The detailed execution of this Paragraph of the Order shall be in accordance with the conditions prescribed in the section of the Decision entitled "The Remedy."

(e) Upon request, bargain collectively with the Remington Rand Joint Protective Board of the District Council Office Equipment Workers as the exclusive representative of the production and maintenance employees in its Ilion, N. Y., Tonawanda, N. Y., North Tonawanda, N. Y., Syracuse, N. Y., Elmira, N. Y., Middletown, Conn., and Marietta, Ohio plants and in its former Norwood, Ohio plant, with respect to rates of pay, wages, hours of employment, and other conditions of employment;

(f) Post notices in conspicuous places throughout its Ilion, N. Y., Tonawanda, N. Y., North Tonawanda, N. Y., Syracuse, N. Y., Elmira, N. Y., Middletown, Conn., and Marietta, Ohio plants stating (1) that the respondent will cease and desist as provided above (2) that such notices will remain posted for a period of at least thirty (30) consecutive days from the date of posting, and (3) in the case of the Ilion,

N. Y. and Middletown, Conn., plants that the Ilion Remington-Rand Employees Association and the Middletown Remington Rand Employees Association are so disestablished, respectively, and that respondent will refrain from any recognition thereof.

3. The allegations in the complaint relating to the discharges of Daisy Johnson, Dolores Greene, Freda Ferris and Susan Ferris and of the Norwood, Ohio employees are hereby dismissed.