SABINE BANK, et al., Appellants,

v.

STATE BANKING BOARD, et al., Appellees.

No. 13502.

Court of Appeals of Texas, Austin.

March 24, 1982.

Rehearing Denied April 7, 1982.

Larry E. Temple, Austin, for appellants.

Mark White, Atty. Gen., Nancy O. Ricketts, Asst. Atty. Gen., Austin, for State Banking Board.

John R. Hohlt, Butler, Binion, Rice, Cook & Knapp, Houston, for Allied Merchants Bank.

POWERS, Justice.

Appellee, Allied Merchants Bank, applied to the State Banking Board for permission to change its domicile from one location to another within the City of Port Arthur, Texas. The Board approved the change over the opposition of appellants, Sabine Bank of Port Arthur, Texas, and First State Bank of Groves, Texas. Appellants sued in the district court of Travis County

for judicial review of the agency's final order approving the change of domicile. The district court affirmed the Board's order and appellants seek further judicial review in this Court, as permitted by the provisions of § 20 of Tex.Rev.Civ.Stat.Ann. Art. 6252–13a (1982), the Administrative Procedure and Texas Register Act (APTRA). We need review only two of appellants' points of error.

## NOTICE OF HEARING ON THE APPLICATION

Appellants contend the agency adjudication was not preceded by reasonable notice as required by APTRA § 13;[1] that the notice which was given was not sufficient to invoke the Board's jurisdiction because it omitted to state the "issues that were considered at the hearing and were decided by the Board"; that the notice which was given "was not consistent with and not based upon the relocation application actually submitted"; and that the district court erred in holding appellants had waived their complaint that the notice was inadequate.

The deficiency in the notice, of which appellants complain, is that it omitted to state the rule promulgated in *Citizens Bank of Bryan v. First State Bank of Hearne*, 580 S.W.2d 344 (Tex.1979). In that case, the Supreme Court of Texas held that an applicant seeking a change in domicile to a new and different banking community must not only obtain a favorable finding by the Board as to whether the public necessity demands another bank in that community, but the applicant must also establish that any abandonment of banking services in the "community" of its original domicile will be consistent with the public necessity which justified the bank's charter based upon the original domicile. Appellants contend this judicial interpretation establishes what is tantamount to an ultimate finding required of the Board, and therefore equivalent to those ultimate findings required of the Board in article 342–305, relative to public necessity, adequate capital structure, expected profitable operation, and so forth, which were referred to in the notice. As such, the rule of the *Hearne* case was required to be stated in the notice; and because it was not, the notice was not reasonable and not in compliance with APTRA § 13(b)(3) and (4). Because we will hold the notice sufficient to comply with the applicable statutory provisions, we need not discuss the issue of whether any error was waived by appellants, as found by the trial court.

One may observe initially that the purpose of notice in a case such as the present is to afford those opposing the application a chance to prepare, that is, to avoid undue surprise. *N. L. R. B. v. Remington Rand*, 94 F.2d 862 (2nd Cir. 1938). It is not necessary to plead the law in order to avoid undue surprise. *Chicago, R. I. & P. Ry. Co. v. United States*, 274 U.S. 29, 47

---

1. Section 13 of APTRA provides in part as follows:

   Sec. 13. (a) In a contested case, all parties must be afforded an opportunity for hearing after reasonable notice of not less than 10 days.
   (b) The notice must include:
   (1) a statement of time, place, and nature of the hearing;
   (2) a statement of the legal authority and jurisdiction under which the hearing is to be held;
   (3) a reference to the particular sections of the statutes and rules involved; and
   (4) a short and plain statement of the matters asserted.
   (c) If the agency or other party is unable to state the matters in detail at the time the notice is served, the initial notice may be limited to a statement of the issues involved.

   Thereafter, on timely written application, a more definite and detailed statement must be furnished not less than three days prior to the date set for the hearing.

   \* \* \* \* \* \*

   Article 342–305 § D of the Texas Banking Code of 1943, Tex.Rev.Civ.Stat.Ann. arts. 342–102 through 342–901, also requires "reasonable" notice. Upon the filing of an application for a new bank charter or a change in domicile, the Commissioner is required to promptly set it for hearing, "giving the applicants and such other banks in the same trade area reasonable notice thereof." *Id.*, arts. 342–305, 342–314. It should be noted that public notice is not contemplated by these statutory provisions. APTRA § 13 provides for reasonable notice to parties in a contested case; Texas Banking Code of 1943 provides for reasonable notice to banks in the same trade area.

S.Ct. 486, 71 L.Ed. 911 (1926). And a notice defective for undue surprise may be cured by allowing time in the administrative proceeding for the affected party to prepare a response to the matter which constitutes a surprise. *Cella v. United States*, 208 F.2d 783 (7th Cir. 1953). Applying these rules to the present case, we observe appellants did not avail themselves of the opportunity for a bill of particulars allowed by APTRA § 13(c); that appellants did not request a postponement of the administrative proceeding to allow them time to prepare to meet any factual issues raised by the rule of the *Hearne* case; that three months elapsed after receipt of the notice before appellants complained of its form on the morning of the hearing; and the question of whether the applicant met the requirement of the *Hearne* case, was fully developed by appellants in the administrative hearing as to the issues of fact and law involved. It does not appear appellants were misled by the notice.

We hold the notice under review constituted substantial compliance with the requirements of APTRA § 13(a) and (b) and with § D of article 342–305 of the Texas Banking Code of 1943. Our holding is based upon a clear demonstration in the record that appellants were not surprised or misled as to the issues of fact and law raised by the *Hearne* case, *N. L. R. B. v. MacKay R. & T. Co.*, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938); *L. G. Balfour Co. v. F. T. C.*, 442 F.2d 1 (7th Cir. 1971); *N. L. R. B. v. Remington Rand, supra.* Moreover, appellants did not claim in the agency proceeding they were surprised or misled by the notice and fully litigated the relevant substantive issues, evidently feeling no necessity for a continuance or for a bill of particulars allowable under APTRA § 13(c). It is also clear to us that the rule of the *Hearne* case is one based upon the Supreme Court's interpretation of article 342–305 § A(1) and what it viewed as the legislative intent of that section. Were we to hold that a judicial interpretation of a statutory provision requires that a subsequent notice set forth the interpretation, we see no end to what could arguably be required to be contained therein. The statutory notice would, in those circumstances, expand into a brief of the law as to all judicial decisions which might arguably be applicable to the administrative proceeding. A case may arise in the future where a judicial decision is of a nature which requires that its holding be set forth in an administrative notice, in order that it may constitute "reasonable" notice, but we do not now have that case before us. We overrule appellants' first point of error, including the claim that the Board lacked jurisdiction.

## APPLICABILITY OF ARTICLE 342–305 § A TO APPELLEES' REQUEST FOR A CHANGE IN DOMICILE

Appellants challenge the sufficiency of the evidence supporting the Board's finding of expected profitable operation under § A(3) of article 342–305, claiming specifically an absence of substantial evidence delimiting a "community," as that word is defined by the Board, wherein the volume of business and expected profitability were determined. Appellee rejoins with the assertion that § A(3) was not applicable to the proceedings, but if it was, substantial evidence was adduced in the administrative hearing to delimit a "community" for the purpose of making the determinations required by § A(3). We will consider first whether § A(3) was applicable in the Board's adjudication of appellee's request for a change of domicile.

At the time material to the administrative proceeding now under review, article 342–314[2] of the Texas Banking Code pro-

---

2. A brief tracing of the evolution of article 342–314 is useful at this point. As originally enacted, the article provided as follows:

No state bank shall hereafter change its domicile without first having received approval for such change from the State Banking Board in the manner provided for the approval of an original application for a charter. 1967 Tex.Gen.Laws, ch. 673, § 2, at 1773. The change of domicile application at issue in the *Hearne* case was determined under this version of the statute.

vided a State bank may not relocate its domicile outside the county of its original domicile, and may not change its domicile within the county, without first receiving approval from the Board "in the manner provided for the approval of an original application for a charter," as set out in article 342–305. Article 342–305 provided that an original charter "shall be granted only upon good and sufficient proof that all of the following conditions presently exist:

A. (1) A public necessity exists for the proposed bank;

(2) The proposed capital structure is adequate;

(3) The volume of business in the community where such bank is to be established is such as to indicate profitable operation of the proposed bank;

(4) The proposed officers and directors have sufficient banking experience, ability and standing to render success of the proposed bank probable; and

(5) The applicants are acting in good faith.

The burden to establish said conditions shall be upon the applicants.

In 1977, the article was amended to read as follows:

No state bank may change its domicile to a location outside the county where it is located. No state bank may change its domicile to another location in the same county without first having received approval for such change from the State Banking Board in the manner provided for the approval of an original application for a charter. Notwithstanding the above provisions, a bank which is domiciled in an incorporated or unincorporated city located in two or more counties may change its domicile to any place located within the county of its domicile or within the same city after receiving the approval of the State Banking Board as above provided.

1977 Tex.Gen.Laws, ch. 10, § 1, at 25–6. The change-of-domicile application now under review was determined under this version of the statute.

In 1981, the legislature amended the statute to omit any reference to new-charter applications, but repeated within article 342–314 itself the five ultimate fact findings the Board must make before approving a change in domicile. The 1981 amendment also, in a rough sense, put into statutory form the rule of the *Hearne* case. The statute presently reads as follows:

(a) A state bank may change its domicile to a location no more than thirty (30) miles from

Appellees contend that the wording of article 342–305 is manifestly inappropriate for an established bank which seeks to change its domicile; and the phrase "in the manner of," used in article 342–314 means simply that the Board must approve the change in domicile, as it must approve new bank charters. Moreover, appellee argues, the Board's Rule 055.03.08.001 sets forth very simply what an application for a change in domicile must contain and the applicant need do nothing more than present for approval an application containing the required information. That rule provides as follows:

A bank may not change its domicile without prior approval from the State Banking Board in accordance with Texas Banking Code Chapter III, article 14 (article 342–314). *An application to change domicile shall be in writing and be filed with the banking commissioner. The application shall state the exact proposed new location and shall be supported with statements, exhibits, maps, and other data, properly verified under oath. The*

where it is located to any place within the city of its domicile. No state bank may change its domicile to another location without receiving the prior approval of the State Banking Board.

(b) Applications for a change of domicile shall be granted by the State Banking Board only upon good and sufficient proof that all the following conditions exist:

(1) a public necessity exists for the bank at the proposed location;

(2) proposed capital structure is adequate;

(3) volume of business in the community where the bank is to be located is such as to indicate profitable operation of the bank at that location;

(4) the proposed officers and directors have sufficient banking experience, ability, and standing to render success of the bank probable; and

(5) the applicants are acting in good faith.

(c) If the proposed relocation of the bank would effect an abandonment of all or part of the community presently served by the bank, the bank must establish that the abandonment is consistent with the original determination of public necessity for the establishment of a bank at that location.

1981 Tex.Gen.Law, ch. 196, at 465–66.

*application shall also include a statement regarding the estimated cost of the new facility.* Each application for a domicile change shall be filed, set for hearing, have notice given, and be ruled upon in the same manner as provided for new charter applications. (emphasis added). Appellees' brief quotes only the emphasized portions of the rule. The portions omitted from appellees' statement of the rule negate the argument advanced by appellees. The first sentence of the rule expressly makes it cumulative of the requirements of articles 342–305 and 342–314. The rule does not purport to supplant the statutory requirements. While there is, no doubt, a degree of discretion allowed the Board in its handling of requests for domicile changes, it did not by its rule delete the five requirements set out in article 342–305, § A on the strength of the phrase "in the manner of" contained in article 342–314. The meaning of this phrase is that the procedure for a change in domicile must closely approximate the procedure which must be followed to obtain a new bank charter, delineated in article 342–305. That is precisely what the rule intends.

Our interpretation of article 342–314 and the Board's Rule 055.03.08.001 is, of course, considerably buttressed by the 1981 amendment of article 342–314. This amendment effectuates precisely what we have said above and indicates the legislative intent which lay behind the expression, "in the manner of," used in the earlier version of the statute which was applicable to the proceeding now under review. Our interpretation is impliedly supported by the opinion in the *Hearne* case which held that the applicant for a change in domicile must satisfy the public necessity at both its new and old domicile if a new and different community is involved. Most importantly, our interpretation is compelled by the general statutory scheme of which articles 342–314 are a part.

In common with other regulatory schemes which regulate entry into a particular business, that which regulates the entry of banks via the licensing process seeks to adjust the competitive relationship between the newcomer and those banks already licensed. The purpose is to avoid too much, or "ruinous," competition destructive of bank solvency and stability, and the consequent social harm such destruction entails, while simultaneously avoiding too little competition and the abuses made possible by a monopolistic position, such as inadequate or overly-expensive banking services. Rose, *Entry into U. S. Banking Markets: Dimensions and Implications of the Charter Process*, 25 Antitrust Bull. 195 (1980). The resulting competitive tension permeates the process by which the Board arrives at the ultimate fact findings required by article 342–305 of the Texas Banking Code. The key determinant is an expected profitable operation in the new geographical market into which entry is sought, without disturbing the stability of the existing order and the solvency of existing banks. So much is necessarily implied in the terms "public necessity," and "profitable operation," and in the entire statutory scheme applicable to the charter process. Public necessity, adequate capital, volume of business, and banking experience and ability are all findings directed at that key determinant. Defining the geographic area within which to assess the competitive effect of the new bank's entry is, therefore, a crucial issue. *See generally*, Fischer, *Geographic Markets Under the Micro-Scope: The Proximity Theory Fails a Test*, 98 Banking L.J. 462 (1981); Note, *Bank Charter, Branching, Holding Company and Merger Law, Competition Frustrated*, 71 Yale L.J. 502 (1962). The foregoing applies whether the new entrant is a newly-chartered bank or an old bank seeking to exploit a new market.

The market affected by the proposed new entrant thus becomes the context for the Board's decision-making process, within which the requisite ultimate findings are made, and without which a charter or change in domicile may not be approved under articles 342–305 and 342–314. While the word "market" is no doubt the logical equivalent of "trade area" in general usage, and both terms were used throughout the

administrative proceeding now under review until almost the very moment the evidence closed, the proceeding was nevertheless governed by the Board's definition of the word "community" in Rule 055.03.-02.002(c). The rule defines "community" to mean not a city or town, nor a market or trade area, but something quite specific: that geographical area from which the bank will draw the majority of its loans and deposits.[3]

■ Article 342–305, § A(3), properly interpreted, required that appellees establish a specific community to be served from the proposed location. And with respect to the community so established, those provisions required appellee to establish as well that the volume of business in that community was sufficient to indicate profitable operation of appellee's bank at the new location. Thus, so far as article 342–305, § A(3) was concerned, appellees were required to establish at least that one community, wherein the requisite showing as to volume of business could be intelligently shown. This burden rested upon appellees irrespective of whether *Hearne* applied to the circumstances.

■ The *Hearne* decision invokes, in all applications for a change of domicile, the additional question of whether the applicant seeks to move its domicile to "a new and different banking community." If the applicant frankly admits in its application that such a move is requested, the *Hearne* case and article 342–305 § A place upon the applicant the burden of proving, as part of its general burden under article 342–305, § A, that any resulting abandonment of banking services in the original community is consistent with the public necessity which underlay the bank's charter to serve the public from its first domicile. We have before us in the present case, however, an application made in circumstances where one may not say as a matter of law that the

applicant seeks to change its domicile to a new and different banking community. In fact, the parties disagree vigorously on that point. Notwithstanding the general burden placed upon the applicant by article 342–305, § A, requiring it to obtain favorable findings on the five propositions listed there, we believe any protesting party who contends that a change to a new and different banking community will result if the application is granted has the initial burden of raising that issue and showing *prima facie* that those are the circumstances. The burden then shifts to the applicant to show: (1) the change does not involve a move to a new and different banking community; or, if it does, (2) no abandonment of banking services in the original community will result; or, (3) the discontinuance of such services is consistent with the public necessity which supported the applicant's receipt of a charter based upon its first domicile. In our opinion, this procedure is the only orderly way to apply the rule of the *Hearne* case. The applicant is required in any event, to establish that the volume of business in the community of the new domicile is sufficient to indicate profitable operation, whether or not that community is a new and different one.

## DOES SUBSTANTIAL EVIDENCE ESTABLISH A "COMMUNITY" FOR DECISION–MAKING PURPOSES?

■ What then is the meaning of the word "community" under which the Board made several findings, some of which were contradictory? The Board previously promulgated Rule 055.03.002(c), which provides as follows:

> In connection with any application for charter the term "community" shall be considered to mean that geographical area from which the proposed bank will draw a majority of the loans and deposits.

We hold the definition is applicable to requests for changes of domicile. The validi-

---

**3.** As discussed above, the agency proceedings must commence with reasonable notice to "other banks in the same trade area." This notice requirement implies the interest of those banks in the competitive effects of the proposed change in domicile, as well as their interest in delineating the "community" which forms the context of part of the decision-making process, as outlined above.

**530**

ty of the definition is not attacked, only its applicability in proceedings to determine an application for change of domicile. Having held appellees were required to meet the provisions of article 342–305, § A, we must necessarily hold that the foregoing definition of community is applicable as well. Being valid, Rule 055.03.02.002(c) was as binding on the Board as it was on the parties before it. *Gulf Land Co. v. Atlantic Refining Co.*, 134 Tex. 59, 131 S.W.2d 73 (1939). And because of the crucial importance of the "community" to the Board's decision-making process, we hold the rule must be complied with strictly and literally, for loans and deposits are equally essential in evaluating the issue of expected profitability.

In its final order, the Board did not state its findings of ultimate fact precisely in the statutory language of article 342–305, § A. With regard to the propositions of volume of business and expected profitability, the Board's final order states as follows:

There is a sufficient volume of business at the proposed new bank site [not in the

"community"] to indicate profitable operation of Allied Merchants Bank at that site. (bracketed material ours).

The order reveals the Board's view that appellees' application did not request a relocation to a new and different community. Appellees' exhibit 19 was a map of Port Arthur upon which was drawn a line marking the perimeter of the community claimed by appellees. The Board expressly found the following with respect to exhibit 19:

[It] delineated [appellee's] *existing* community, defined as that geographical area from which the bank derives a majority of its loans and deposits. Both the existing domicile ... and the new domicile ... are within this geographical area. (emphasis added)

Curiously, however, the Board also found that appellees' evidence showed a compliance with the holding of the Supreme Court of Texas in the *Hearne* case, which applies only when the applicant requests a change in domicile to a new and different community.[4] In addition to these mutually exclu-

---

4. The Board's order reads in pertinent part as follows:

In deciding to unanimously grant this change of domicile to Allied Merchants Bank, the Board has been cognizant of and has applied the rule of the Supreme Court in the case of *Citizens Bank of Bryan v. First State Bank of Hearne*, 580 S.W.2d 344 (Tex.1979). The Board believes that Allied Merchants Bank has met the dual tests of the *Hearne* case, to justify why it seeks to leave its present site and demonstrate a public necessity and profitable volume of business at its new location.

One observes immediately that the "dual tests" attributed by the Board to the *Hearne* case are quite erroneous. The opinion in that case states something quite different from the proposition that the application for a change in domicile must (1) justify why it seeks to leave its present site, and (2) demonstrate a public necessity and profitable volume of business at its new location.

The substance of the *Hearne* decision, relative to changes in a bank's domicile, is this: It was error for the Board to limit its consideration of public necessity to that which existed at the proposed new location of the bank's domicile. The statutory scheme which provides the regulation of banks, and the reasonable intendments arising from those statutes, require that the proposed change in domicile comport with the "public necessity" in (1) the new and differ-

ent banking community which the bank intends to serve; *and*, (2) the community served at the original domicile, if any banking service will be abandoned in that community. The *first* such showing is, of course, required by article 342–305, § A(1), of the Texas Banking Code, orchestrated with article 342–314 as it existed at the time of the *Hearne* decision. The *second* such showing the court inferred from the general regulatory scheme constituted by the statutes which regulate banking in the State. The judge-made rule promulgated in the *Hearne* case applies only when the change of domicile, for which application is made, seeks approval "to move an existing bank from the place it was chartered to serve to a new and different banking community ...." 580 S.W.2d at 347. The "dual test" attributed to the *Hearne* decision is thus quite wide of the mark. The applicant must show a "profitable volume of business at its new location," not by force of the *Hearne* decision, but because articles 342–305 § A(3) and 342–314 of the Texas Banking Code require that showing, to be made in the context of "the community where such proposed bank is to be established ...." Moreover, the applicant is *not* required by force of the *Hearne* decision to "justify why it seeks to leave its present site." Rather, that decision requires that the applicant, with regard to the original community which it was chartered to serve, established that any abandonment of banking

sive findings, the remainder of the Board's final order recites subsidiary findings to the effect that the new location would be a better site for the applicant than its present downtown location, both from the standpoint of public need and expected profitability; that the present location in downtown Port Arthur is in the midst of a deteriorating area as compared to prosperous and expanding surroundings at the new location; that the downtown area has been re-zoned for light industrial and heavy commercial use; that the downtown location was inconvenient for serving appellees' community; that appellee suffered a net loss of 2,900 deposit accounts at the downtown location during the period of June, 1975 through June, 1979; that this loss of accounts occurred notwithstanding appellee's being competitive with appellants during the period, in terms of service charges and loan-pricing policies; and, that appellee's relocation would likely result in a greater growth of its deposits. Other findings recited in the order were directed at the ultimate findings, apart from expected profitability and public necessity, required by article 342–305 of the Texas Banking Code.

■ Appellants complain that any finding of "community" by the Board is not reasonably supported by substantial evidence, a contention with which we agree.

This determination was essential to establishing the ultimate finding of expected profitability set forth in article 342–305, § A(3) and to the application of the *Hearne* rule as well.

Appellee's position was that its request for a domicile change involved no new and different community. On the chance that its argument against the applicability of article 342–305, § A might fail, appellee undertook to establish the volume of business in a particular community. And because appellee contended no new and different community was involved in its application, it undertook to establish the geographical area from which the majority of its existing loans and deposits were drawn.[5]

On the last day of the hearing, in rebuttal of appellants' case, appellee called as a witness Mr. Perry Shepard, a banking consultant. The parties agreed that his opinion testimony was admissible in matters involving his expertise. In calling Mr. Shepard, appellee quite frankly admitted that no preceding evidence had identified "what the community to be served is, as those terms (sic) are defined in our state banking law." Then, in response to questioning by appellee's counsel, Mr. Shepard testified that he had determined the area and configuration of the community to be served from the new domicile—that they were shown by the line drawn by him that morning on a map

---

service at that location "would be consistent with the public necessity previously determined by the Board to require the service."

Because the Board found that the change in domicile requested by applicant was within the original community which it was chartered to serve, one is at a loss to explain why the Board applied the *Hearne* rule in its adjudication of the present contested case. While this contradiction does quite clearly show an error, it is not clear whether the Board erred in its finding that appellees merely sought permission to change its domicile within the same community that it was originally chartered to serve, or in its finding that the rule of the *Hearne* case was satisfied by the evidence adduced before the Board. As mentioned in the text of the opinion, we believe the issue immaterial because the evidence adduced in the hearing never clearly established any kind of "community" at all, in the definition utilized in the Board's Rule 055.03.02.002(c), and thus no context for reasoned decision-making was ever established.

5. Appellee first received a banking charter in 1909. Before enactment of the Texas Banking Code of 1943, charter applicants were not required to make any showing relative to volume of business and expected profitability in a specific community. They were required as early as 1913 to submit to an investigation by the Board directed at the "public necessity of the business in the community in which it is sought to establish" the bank. 1913 Tex.Gen.Laws, ch. 110, at 211. One cannot escape the thought that the meaning of the word "community" evolved from the idea of city, town or village to the mathematical test of Rule 005.03.02.002(c) primarily because of urban sprawl. In this rule, the word "community" is not used in its normal usage, that is, a particular inhabited area, but is used as a word of art, defined as the geographical area from which the majority of the applicant's loans and deposits are drawn.

of Port Arthur marked as Exhibit 19. Mr. Shepard stated, simply and positively, that in drawing that line he used the definition set out in Rule 055.03.02.002(c), that is, the geographical area from which the applicant draws the majority of its loans as well as its deposits. Exhibit 19 was admitted in evidence over appellants' objection. The question thus reduces to whether this simple evidence amounts to substantial evidence, for there is no other evidence in the administrative record which tends to show the geographical source of appellee's loans.

On cross-examination, appellants elicited from Mr. Shepard the clear admission that the number and dollar amount of appellee's loans were not contained in the record and that he, Mr. Shepard, did not know those facts. With some brief testimony about deposits and organizational matters, the hearing terminated.

Being of crucial importance, direct evidence as to appellee's loans should have been introduced, just as appellee unquestionably did with respect to the geographical source of its deposits.[6] This loan information must have been in appellee's possession. It, along with the information concerning appellee's deposits, was required to establish the community or context within which the Board was required to determine that the volume of business was such as to indicate profitable operation.

Mr. Shepard admitted he did not know the number and dollar amount of loans in the geographical area he assigned to appellee's existing community. No direct evidence was introduced to show the number, amount, or geographical distribution of appellee's loans. In these circumstances, Mr. Shepard's conclusion that the line drawn on Exhibit 19 as marking the perimeter of the community amounts to no evidence at all, for if the line is indeed based upon the geographical distribution of appellee's loans, then it is based upon hearsay in its entirety, as was Mr. Shepard's testimony

that the line conformed to the community specified in Rule 055.03.02.002(c). *Moore v. Grantham*, 599 S.W.2d 287 (Tex.1980); *Aetna Insurance Co. v. Klein*, 160 Tex. 61, 325 S.W.2d 376 (1959); APTRA §§ 14(a), 19(3)(5), 20; Kuhl, *Evidence in Texas Administrative Adjudication*, 15 Hous.L.Rev. 682 (1978).

We hold, accordingly, there is no substantial evidence in the record of administrative proceedings to support the Board's findings relative to volume of business and expected profitable operation. No evidence in the record tends to establish a community as defined by the Board in Rule 055.03.02.-002(c), and, therefore, a context within which to rationally determine the questions of business volume and expected profitable operation as required by article 342–305, § A(3). We hold as well that the agency decision in these circumstances prejudiced substantial rights of the appellants. Accordingly, we reverse the judgment of the district court and remand the cause to that court with instructions to reverse the final order of the Board and remand the cause thereto for further proceedings. As a result, we do not reach appellants' remaining points of error.

6. We find no indication in the reported cases that the word "majority" used in Rule 055.03.-02.002(c) refers to the number of borrowers and depositors, the aggregate dollar amount of loans and deposits, or a weighted value assigned to loans and deposits as produced by a correlation between the number of borrowers and the amount of their loans, or between the number of depositors and the amount of their deposits. The parties to the appeal not having a dispute in this respect, however, we will not discuss it.