## NATIONAL LABOR RELATIONS BOARD v. GIANNASCA.

Circuit Court of Appeals, Second Circuit.
May 5, 1941.

Leslie Clifford, of Washington, D. C., for petitioner.

Richard M. Monfried, of New York City, for respondent.

Before L. HAND, SWAN, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

This case comes up upon the report of a special master heretofore appointed to determine whether the respondent had violated a consent order of the usual form, entered on May 9, 1940. The Board alleges that the respondent violated the decree in three matters. First, he did not reinstate his striking employees immediately, as directed; and when he did, he discriminated against them by cutting their wages. Second, he did not bargain with the union in good faith. Third, he failed to post the required notices promptly; and by retaining strikebreakers deprived the returning strikers of the full relief granted them. The master held extensive hearings, resulting in about 500 pages of testimony, and filed a report finding that the respondent had not violated the order at all.

■ It seems to us that the striking employees were taken back soon enough. Thirty-three returned to work on May 16th and demanded immediate reinstatement. (One had gone back on May 14th.) The respondent employed five on the 16th, five on the 17th, two on the 18th, eleven on the 20th, three on the 21st, three on the 22nd, and one on the 23rd. Thus he had taken back 23 within five days and the other seven at the end of seven working days. The other three drifted off in some way not disclosed. The respondent could scarcely be expected to find places for all of these men instanter in a shop which had less than 55 in all; he had to adjust a going business to what was nearly a complete change of personnel. The word, "immediately," in the order must be interpreted reasonably. On the other hand a careful analysis of the evidence relating to wages forces upon us the conclusion that the respondent did discriminate against the returning strikers. These he concededly cut and gave as an explanation that his business had fallen off a great deal during, and because of, the strike, so that on May 16th he could no longer afford the same wage scale that had been in force on February 20th, when the strike began. For this reason he was forced not only to take off an increase of 10%, granted before February, 1940, but in addition to impose a cut of 10%. This testimony the master accepted,

and so should we, were it not for certain instances which seem to us to contradict the respondent's explanation. He employed five strikebreakers between the 23rd of February and the 13th of March, none of whom he cut at any time. One of these, employed on February 24th, and another, on March 6th, he paid 60 cents an hour; and to two others, employed on the 28th he paid 35 cents. The fifth, Chiarella, got 50 cents, but as there was testimony that he was a particularly good worker, we will disregard him. The wages of those employed in February could not yet have been influenced by any actual falling off in the business; and any prospective falling off would depend upon how long the strike might last, which no one could tell. Another instance was the woodworkers. One of these, Morello, was employed on May 6th at 40 cents an hour and raised on May 17th to 50 cents; and while it is of course possible that he had proved to be an exceptionally good workman, the record does not definitely show that he was. The same is true of Nick DeSimone, who was employed on April 15th and raised on May 17th. Roberto, hired on May 13th at 65 cents, was put on piece work on the 17th, which did indeed result in his earning less, but with that exception and the somewhat obscure circumstances surrounding Calamartino no strikebreaker or employee who did not strike was cut at all, and five or six were raised while every striker was cut except those upon the minimum wage; and indeed Maria Voce was cut to 65 cents from 75, and John Batory from 65 cents to 60; in spite of the fact that Voce was a department head, and Batory was an outstanding workman. The only other 60 cent men were Carrado and Angelo, strikebreakers employed on February 24th and March 6th, who also do not appear to have been especially valuable. Chester Stec, a striker, was cut from 50 cents to 42 cents, though Nick DeSimone, employed on April 15th at 50 cents, was raised on May 17th to 52 cents. They were doing the same work, although it is true that the respondent swore that he thought De-Simone "not quite as good as" Batory "but pretty near to" him. It is of course impossible to be positive but in the face of this evidence we cannot accept the respondent's explanation.

■ The second question is whether his refusal to bargain with the union was in good faith. There was a good deal of ap-

parent negotiation back and forth, wholly inconclusive, in which the respondent retreated from a number of positions. Each side clearly distrusted the other; the respondent had originally refused to deal with the union at all, and remained unwilling to do so except as he had to. After the order passed, it may well have been that he was merely keeping up a pretense of negotiation and never meant to come to an agreement. Certainly the evidence permitted that conclusion, and if the master had found the opposite, we should have affirmed him. The issue of bad faith is always difficult to decide; it is seldom possible to be sure of another's state of mind, and the findings of the tribunal of first instance should be especially cogent. We cannot find such a clear preponderance in the case at bar as to overrule the master upon this point.

 The third question is the violation of three commands of the decree: (1) delay of two weeks in posting the required notices, which does not appear to us to justify any penalty; (2) delay in reinstatement (which we have already considered); (3) retention of strikebreakers after the strikers were taken back. The respondent's factory population was substantially the same on February 20th and May 23rd, fifty-two as against fifty-three. For this reason the respondent argues that there was no discrimination in keeping on all the strikebreakers. However, it appears that on May 23rd there were sixteen men who got a week of less than forty-two hours while on February 20th, there had been only three; of these sixteen eleven were strikers. The respondent explained that he kept the strikebreakers because he feared a renewal of the strike and wished to have a reserve. However, the order had provided that "all persons hired after February 19, 1940, shall be dismissed, if necessary, to provide employment for those to be offered reinstatement upon application. If thereupon by reason of a reduction in the force of employees needed, there is not sufficient employment immediately available for the remaining persons who went on strike on February 19, 1940 * * * all available positions shall be distributed among such remaining employees." Verbally this provision was satisfied if all strikers who applied were taken back; but under the circumstances that was not full compliance. The purpose of this provision was to insure the returning strikers that the strike should not prejudice their position; that is, that they should have as good jobs as though there had been no strike. It is true that when they came back there were no more in the factory to divide the work, than when they left. Of course they had to take their chances of what work there would be; but we think that the order did not subject them to other chances than those which would have arisen from the respondent's judgment uninfluenced by the fear of a second strike. If he chose to maintain a reserve, he was of course free to do so, but not to the prejudice of the returning strikers; the order secured them the benefit of his judgment based upon the number of men who could efficiently do the work in hand, and that he did not give them.

For the foregoing reasons the report will be modified by holding the respondent in contempt for discriminating against the strikers in wages and for retaining the strikebreakers. We impose a fine of $250, together with the fee of the master, which we fix at $750, and the other expenses of the reference.

Enter an order in accordance with the foregoing.

CLARK, Circuit Judge (concurring in the result).

With some doubt whether the master's fee should exceed the usual government rate of $25 per day for independent trial examiners and like officials, I am willing to concur in the result. So far as respondent is concerned, a moderate penalty may well be adequate to convince him that he must obey court orders.

But I do think the decision should be put upon broader grounds, for it seems to me clear that respondent did not bargain with the union in good faith, but was intentionally hewing as close to the line of illegality as he could. From the beginning his conduct shows a pattern unfortunately far from unusual in these cases, amounting in substance to a repudiation of the policy of the National Labor Relations Act by fighting union representation by non-employees. But he did not wish to put the matter to test, for the occurrence of a strike followed by a Labor Board complaint led to his agreement to an enforcement order of this court. His consent does not detract from the force of the order. Pittsburgh Plate Glass Co. v. N. L. R. B., 61 S.Ct. 908, 915, 85 L.Ed. ——.

When, however, the strikers, accepting this peaceful settlement of the dispute, sought to resume work, he expressed surprise that they should do so, and delayed acting until he had consulted his lawyer, if not longer. I would agree that these delays, if alone, could be overlooked; the significance of the matter was that he thus immediately disclosed his attitude to his employees and put all further negotiations in jeopardy. Thereafter, as the employees gave up one bargaining point after another, he retreated step by step to firmer ground, until at the end his victory was complete. All the workers' demands embodied in the contract they offered had been rejected—closed or preferential shop, no work on "struck goods" from other factories with labor troubles, no subcontracting, a wage increase. But further, the strikers who were re-employed had suffered a wage cut, the strikebreakers were not discharged, but were continued at the wages for which they had been hired, and "loyal" or non-striking employees (including relatives) received increases.

The master was able to excuse these various acts by considering them separately, and not as parts of one single picture. Thus he found the pay raises inconsequential and the reductions to the strikers necessary because of respondent's losses. Passing the question whether losses can be inferred merely from proof of lessened gross sales alone, it would seem that a showing of good faith in negotiation here would require the strikers to feel the loss last, rather than first. The master took no exception to the suspicion with which respondent viewed all attempts at negotiation, even walking out of meetings because of the bandying of epithets in which he appears to have participated. On the other hand, the master did criticize the Regional Director of the Labor Board for her endeavors to promote settlement. His conclusion, it seems to me, is one which would make of the enforcement order of this court a really efficient weapon of strikebreaking; certainly it would hardly conduce to peaceful labor relations or promote the objectives of the act.

The opinion herewith of course substantially rectifies that result. But I think it does make somewhat the same error as did the master of treating respondent's various acts as more or less separate and distinct, rather than all of a piece. And I fear it may leave the result in some confusion, for if the parties do not now settle their differences there remain some possibilities of controversy as to just how far we think respondent can go in still opposing the union's representatives.

Experience, I think, now shows that there is serious question as to the wisdom of committing the last and perhaps most delicate step of labor law enforcement—proceedings in contempt—to somewhat alien professional interests as in effect a court of first instance. I suggest that so to do is unfair to the dignity of this court in maintaining respect for its orders and to the public interest which we are to safeguard. If the Board acts in a public capacity to give effect to the declared policies of the act, Phelps Dodge Corp. v. N. L. R. B., 61 S.Ct. 845, 852, 85 L.Ed. —, so obviously do we also. Further, we lose the very quality of expertness and exercise of wise discretion in difficult and troubled situations which is the essential basis for committal of such matters to agency control. International Association of Machinists v. N. L. R. B., 311 U.S. 72, 82, 61 S.Ct. 83, 89, 85 L.Ed. —. Moreover, the long wait while the new tribunal is familiarizing itself with the law and the facts—here delaying settlement of an active labor dispute for a year after seeming agreement, though the underlying facts were substantially undisputed—underlines perhaps the chief problem of administrative procedure, that of delay in effective action. I suggest that the taking of testimony for our consideration on these proceedings should be had promptly through the trained examining staff of the Board itself; we, of course, must pass upon the trend and effect of the testimony when taken. If this is not to be done, I see no other proper course than the taking of such testimony before the court itself or some of its members.