## NATIONAL LABOR RELATIONS BOARD v. REMINGTON RAND, Inc.

### No. 153.

Circuit Court of Appeals, Second Circuit.

Sept. 29, 1942.

Robert B. Watts, Gen. Counsel, Malcolm F. Halliday, Asst. Gen. Counsel, Gerhard P. Van Arkel, Louis Libbin, John H. Dorsey, Attys., and Harold S. Roberts, Economic Adviser, all of Washington, D.C., for petitioner.

Sullivan & Cromwell and Franchot & Schachtel, all of New York City (David W. Peck, of New York City, of counsel), for respondent.

Before AUGUSTUS N. HAND, CLARK, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

This is the latest proceeding in a controversy which dates back to 1935. Upon petition of the National Labor Relations Board, the court issued an order on June 4, 1940, directed to Remington Rand, Inc., and its officers and agents to show cause why it should not be held in contempt for failure to comply with a decree of this court entered on March 10, 1938. N. L. R.

B. v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, certiorari denied, 304 U.S. 576, 58 S.Ct. 1046, 82 L.Ed. 1540. Thereafter, by an order of the court dated June 14, 1940, a Special Master was appointed "to take proof on the issues * * * and to report to the court thereon with finding of fact, conclusions of law, and recommendations as to disposition of the issues." This case now comes before us upon the ad interim report of the Master, which deals only with the dispute as to the Elmira and Middletown plants. No proof has as yet been taken before the Master as to the issues at respondent's other plants.

The facts of this controversy have been fully set forth in our previous opinion. 94 F.2d 862. The court there issued a decree, dated March 10, 1937, modifying and amending the order of the Board, and directing that it be enforced. This is the decree with which the Board charges a failure of compliance. On March 31, 1938, the Board moved to hold Remington Rand in contempt for failure to comply with the court's decree, and we denied that motion on June 1, 1938 without prejudice to its renewal if the decree had not been complied with on July 15, 1938. 97 F.2d 195. We remarked at that time the "unexampled persistence" with which the company had sought to fend off enforcement of the Board's order, and said that although "we are not convinced that it (Remington Rand) is as yet disposed to conform, we will not impose any penalty for the moment."

The following "Remedy" was provided for in our decree[1]: "The respondent will be ordered to reinstate all those production and maintenance employees involved who were employed on May 26, 1938, and who have not since received regular and substantially equivalent employment elsewhere. As the first step in carrying out this general order, such production and maintenance employees shall be reinstated to their former classifications, on the basis of seniority by classifications, where positions in such classifications are now or have been filled by individuals employed since May 26, 1936, who were not employed on

that date, the respondent dismissing such individuals if that is necessary to accomplish the reinstatement so ordered. In this fashion, as far as possible, employees will be reinstated in the plants in their own towns and will not be required to move elsewhere. But after such reinstatement, there will still be a large group of employees, composed almost exclusively of Norwood, Syracuse and Middletown employees, who will have to move to other cities in order to obtain reinstatement. Consequently, all such production and maintenance employees not reinstated in the plant in their own towns shall be grouped together, regardless of the plant in which they were previously employed, on a single preferential list on the basis of seniority by classifications, to be offered the positions at the Elmira plant, and any positions still available at any of the other plants after those who struck at such plants have been reinstated. At Elmira, as well as elsewhere, individuals employed since May 26, 1936, who were not employed on that date must be dismissed if such action is necessary to effectuate such reinstatement. Thereafter, this list shall be drawn upon whenever further employees are needed at any of the plants involved, including the Elmira plant, preference being given to employees on the list then residing in the locality in which employment is available."

It should be noted at the outset that Rule 53(e) (2) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, provides that "* * * the court shall accept the master's findings of fact unless clearly erroneous." While that Rule literally applies solely to the District Courts, we think it should be applied here by analogy, especially as it conforms with the general practice existing before the promulgation of that Rule.[2] We have applied Rule 41, by analogy, to practice in this court. In re Barnett, 2 Cir., 124 F.2d 1005, 1013.

The Board has not suggested any impropriety in our reference of the issues to the Master. Indeed in another case,[3] in May

---

[1] § 2(d) of the decree, providing for reinstatement of production and maintenance employees at respondent's various plants, contained a proviso that "The detailed execution of this paragraph of the Order shall be in accordance with the conditions prescribed in the section of the Decision entitled 'The Remedy.'"

[2] See In re Central Railroad of New Jersey, 2 Cir., 52 F.2d 20, 21; Fifth Nat. Bank v. Lyttle, 2 Cir., 250 F. 361, 363; Armstrong v. Belding Bros. & Co., 2 Cir., 297 F. 728, 729; In re Slocum, 2 Cir., 22 F.2d 282, 285.

[3] Corning Glass Works v. N. L. R. B. The Board's memorandum is quoted in

1941 (subsequent to our order of reference in the instant case), the Board filed a memorandum in this Court objecting to a proposal by an employer-respondent that questions as to compliance with an enforcing decree of this Court should be referred to the Board rather than to a Master; in that memorandum the Board said: "In such a proceeding the Board and the employer are in an adversary relation. If the Board proceeded to make findings of compliance, there is nothing in the statute which would entitle such findings to greater weight than the statements of any other litigant. The Board has no power to determine what constitutes compliance with the decree of this Court." And we know of nothing in the decisions of the Supreme Court which, in general, suggests that the Board's views on that subject should be disregarded.[4]

## I.

### The Elmira Plant

Twenty-seven polishers in respondent's Elmira plant were discharged in June, 1939, following a strike there. The Board claims that the respondent discharged and locked out union employees who had ceased work in a labor dispute. The facts are as follows: Prior to May, 1939, the company had laid off employees in disregard of seniority. The union protested and the matter was adjusted. In May, 1939, the company consulted Bassett, who was chairman of the shop committee, about a list of men to be laid off. Two of these, Mathews and Howell, were union men. The company, at Bassett's request, substituted the names of Maloney and Scheisepen, nonunion men, because the latter were less able workers. Mathews and Howell had only two days' less seniority than Maloney and Scheisepen. The agreement was carried out. On May 5, however, Maloney and Scheisepen were reinstated at their request, and Mathews and Howell were laid off. Bassett protested the violation of the agreement, and all four men were kept on. There was enough work for all, and all worked full time. Bassett continued to object, however, that, with Maloney and Scheisepen back at work, respondent was not keeping its May 4 agreement. He feared that, in time of slack, Mathews and Howell would be the first to be laid off.

On June 5, negotiations having broken down, the union men stood at their machines and refused to work until the company cured the violation of the agreement. The men were then asked .to leave the plant peacefully, which they did. They were all discharged by letter the same day.

The Master found that the strike was not a lawful one, that no labor dispute was involved and that the discharge of the strikers was no violation of the decree. He further found that the dispute which existed was "determined" when the company heard grievances and made up its mind.

The Master's findings were clearly erroneous. Section 2(9) of the National Labor Relations Act, 29 U.S.C.A. § 152(9), defines a "labor dispute" as inclusive of "any controversy concerning terms, tenure or conditions of employment * * *." An "employee" is defined in § 2(3) of the Act, 29 U.S.C.A. § 152(3), as "any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice * * *." Section 8(3), 29 U.S.C.A. § 158(3), provides that "it shall be an unfair labor practice for an employer *, * * by discrimination in regard to hire or tenure of employment or any term or condition of employment * * * to encourage or discourage membership in any labor organization * * *."

█ The above language of the statute does not lend itself readily to misinterpretation. If the Elmira strike was a "controversy concerning terms, tenure or conditions of employment," which it certainly was, then indubitably, it was a "labor dispute" within the meaning of the statute.

We cannot agree with the Master that there was no labor dispute here, merely because the dispute was "determined" when the company heard grievances and made up its mind. So to hold would go a long way towards emasculating the Act, and would render it difficult, if not impossible, ever to discover any state of industrial discord which could accurately be termed a labor dispute.

The real issue here is whether or not the respondent's act of firing the 27 strikers was contumacious and contemptuous of the

our recent opinion in that matter, July 11, 1942, 129 F.2d 967.

4 Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217, decided that when an order of the Board directs reinstate-

ment with back pay, the specific issue of an employee's potential earnings from potential employment by other employers should be sent to the Board, but the Supreme Court went no further.

court's decree. The Board claimed that the discharges violated Section 1(a) and 1(c) of the decree of the court. Section 1(a) of the decree required respondent to cease and desist "from in any manner interfering with, restraining or coercing its employees in the exercise of their right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purposes of collective bargaining and other mutual aid or protection * * *" Section 1(c) required that the respondent cease and desist "from discouraging membership in any of the labor organizations affiliated with the Remington Rand Joint Protective Board of the District Council Office Equipment Workers, or any other labor organization of its employees, by discharging and refusing to reinstate employees, or otherwise discriminating in regard to hire or tenure of employment or any form or condition of employment, or by threats of such discriminations * * *."

We think the discharges were discriminatory. The fact that prior concerted refusals to work on the part of employees who had worked during the strike, marked in one instance by violence, were in no way penalized by respondent, gives rise to an inference of bad faith and discriminatory motive for the discharges.[5]

The respondent's defense rests mainly on the contention that a plant rule had been violated. The letter of discharge read: "By your refusal to work today, a violation of plant rules, you have terminated your employment, effective today." The haste with which the strikers were discharged is further ground for an inference of discrimination. The immediate discharge gave no locus penitentiae and attempted to sever the employment relationship.

■ It is clear from the definition of an "employee" in § 2(3) of the National Labor Relations Act that a strike does not terminate the employer-employee relationship, where the individual has ceased work in connection with a current labor dispute or because of an unfair labor practice. Nor does the fact of a strike of itself relieve the employer of his duty under the Act to bargain collectively with his employees.[6]

In the Mackay Radio case,[7] the Supreme Court held that an employer whose employees have struck and who has committed no unfair labor practice is not obliged to discontinue his business but may hire others in the place of the strikers. The employer's obligation to reinstate in such case extends only to such of the striking employees as have not been replaced during the strike. Where, however, the employer has been guilty of an unfair labor practice, he is under a duty to reinstate all striking employees, even though this may occasion the discharge of those employees hired to take the place of strikers during the strike.

■ Thus, in the instant case, the polishers having gone on strike in a current labor dispute, retained their status as employees for the purposes of the Act and its protective provisions. As such they had a right to apply for and to be reinstated. If respondent was guilty of an unfair labor

---

[5] Apparently there were two such instances: On May 9, 1938, employees at respondent's Ilion plant, who had worked during the strike, stopped work in various departments, refused to work with returned strikers, and attempted to prevent them from working and to evict them by force and threats of violence. There is some testimony to the effect that this occurred in the presence of supervisory employees. Respondent admitted that the employees who caused, and participated in, this disturbance were not discharged, and that no disciplinary action was taken against them. The reason given was that to have done so would have interfered with production.

Attorneys for both parties stipulated as follows concerning a stoppage of work at "various plants of respondent, on or about June 1, 1938:" "On or about that date, the employees who had worked during the strike engaged in a stoppage of work extended over the time of about a half-hour to an hour. No one who engaged in the stoppage of work was discharged. * * *" Howland, manager of the Middletown plant, testified that the reason for this was that it would have "stopped production. * * *" However, when he was asked later on whether stoppage of work on the part of an employee would terminate his employment, Howland replied that this was correct, in a "majority of instances."

[6] Black Diamond S. S. Corp. v. N. L. R. B., 2 Cir., 1938, 94 F.2d 875, 879, certiorari denied 1938, 304 U.S. 579, 58 S.Ct. 1044, 82 L.Ed. 1542.

[7] N. L. R. B. v. Mackay Radio & Telegraph Co., 1938, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381.

practice, this right was unconditional. If it was guilty of no unfair labor practice, the right existed, nevertheless, subject however to the condition that only such strikers could seek and get reinstatement as had not already been replaced during the strike.[8]

Respondent, by its immediate discharge of the strikers and attempted abnegation of the employment relationship, was guilty of an unfair labor practice. It sought to discharge strikers who, under § 2(3) of the Act were still its employees and who were thus entitled to apply for reinstatement or at the very least entitled to reinstatement where their jobs remained unfilled.

Respondent, though it sought to do so, could not deny the right to reinstatement to the striking polishers. Even if there had been no unfair labor practice, respondent could not rely upon its alleged right, if any, to discharge the strikers, because in the instant case, the strikers were discharged without being—or before being—replaced.

The summary and immediate dismissal by respondent of the strikers, while also in contravention of the National Labor Relations Act, was a direct violation of § 1(a) of our decree in that it interfered with, and restrained, the striking employees from bargaining collectively and from "engaging in concerted activities for the purposes of * * * mutual aid or protection. * * *" It also violated § 1(c) of our decree in that it tended to discourage union membership. The inference of discriminatory treatment is unmistakable when a comparison is made between the discharge of the 27 strikers and respondent's attitude towards concerted refusals to work on the part of non-union employees in its other plants.

 We find that respondent violated our decree[9] and we now order that the 27 polishers be reinstated, and paid their loss in wages. The matter is referred to the Master for the taking of evidence, and to determine the net amount of back pay.

## II.

### The Middletown Plant

The evidence in this part of the case falls into two categories: first, evidence of a statistical character as to employees generally; second, evidence relative to specific instances of alleged contempt directed against individual employees. The statistical charts contain evidence of a general nature, and also include evidence as to individual cases which are not included in the second category. We shall deal first with the general statistical evidence.

1. The Board's master chart is a statement of the "days, hours and weekly earnings of all employees" at the Middletown plant from the week ending July 23 to October 15, 1938. The chart divides the workers into three classifications: the old employees (those who returned to work before June 1, 1938), the new employees, and

---

[8] It should be noted that even where a strike which initially involved no unfair labor practice is prolonged or aggravated by an employer's unfair labor practice, the same rule applies as where the strike is the *result* of an unfair labor practice, and the employer is bound to reinstate all strikers and discharge all those hired to replace them during the strike. M. H. Ritzwoller Co. v. N. L. R. B., 1939, 15 N. L.R.B. 15, enforced as modified, 7 Cir., 1940, 114 F.2d 432.

[9] There can, of course, be no question as to the power of this court to punish acts in contempt of its decree.

The language of our enforcing decree, set forth above, was broad enough to forbid respondent's conduct. The fact that such conduct also violates the National Labor Relations Act and is thus a totally new violation of the Act, does not therefore render a new proceeding before the Board necessary. N. L. R. B. v. M. Lowenstein & Sons, Inc., 2 Cir., 1941, 121 F.2d 673. In that case, this court had issued a decree directing the disestab-

lishment of a company union. The respondent complied with the decree. Two years later, the Board claimed that the respondent was again fostering an "unaffiliated union." This was an entirely new union, having no connection with the first. The question raised was whether the Board was required to institute a new proceeding, or whether the court could proceed by contempt. This court there said (121 F.2d at page 674): " * * * the illegality of what is charged has already been determined. Again, since the upshot of a new proceeding could be no more than a new injunction, the respondent would never be brought to account for what by hypothesis is contumacy of the existing injunction. Indeed it is not altogether fantastic to suppose that over a period of years it might in this way avoid all accountability for a continued series of such wrongs. For these reasons it seems to us that some remedial measures are presently necessary, if the facts are as the Board asserts, and that we should not remit it to a new proceeding."

the strikers (who returned to work after June 1). The purport of the chart is plain and unmistakable. The strikers, as a whole, received less work and less pay than the other two categories of employees.

The Master erred in giving no weight to the Board's statistical data. While that data was not prepared in its most effective form, yet it was based on evidence in the record and tended to show discrimination in that the strikers who returned to work after June 1, 1938, did receive less work and less pay than the other employees for the three months' period.

■ The respondent contended that this chart was generally inaccurate, but in view of the fact that the Board checked its facts with respondent and gave careful attention to the correction of details, this contention appears to be without substance. The respondent further objected to the brevity of the time span (only three months, ending October 15, 1938) and to the differentiation in classification of the strikers, who had returned to work after June 1, 1938, and those who had joined the "back-to-work" movement. Although they impressed the Master, neither of these objections seems to us to derogate from the validity of the chart. It was quite rational to treat the two groups of strikers separately, and the disparity in the actual earnings of the two tends to illustrate that the company was less concerned about those whom it was forced to reinstate than those who fell in line with its "back-to-work" scheme. As to the brief span of time which the chart covers, that is the vital period upon which the Board relies mainly for its charge of contempt. It was important to get an over-all picture of how the respondent was complying with the court's decree, and in this respect we find that the chart was entirely serviceable. Accordingly, we conclude that the Board made out a prima facie case, and had the matter rested there, we would overrule the Master.

But the company introduced testimony by Brainerd, its personnel and employment manager, which may be summarized thus: The company, beginning a week after this court's decree of June 1, 1938, reinstated all strikers as rapidly as was possible, consistent with a policy of keeping the plant open and in full production; and, if an effort had been made to reinstate strikers more rapidly, production would have fallen off to the point where other workers, including returned strikers, would have suffered losses in earnings.[10]

---

[10] Brainerd gave the following testimony, on direct examination, before the Master:

"Q. Will you say whether or not you did train all workers for the jobs of new workers, for the jobs being done by new workers? That is, did you train these old workers to do the jobs which at the time they could not perform? A. Yes, sir; we did. Q. Did you do that at once or how was it done? A. As rapidly as it could be. We could not go into that all in one jump, but by the end of October all had been removed from the preference list and placed to work or had declined a definite offer of a job. Q. Now, may I summarize that? If I understand it correctly, between July 15, 1938 and October 1938 you trained these old workers which could not perform the job held by new workers; you trained them to perform those jobs during that period just as rapidly as you could consistently with keeping the plant going? A. Yes, sir. Q. Will you say whether or not it would have been physically possible to keep the plant going to have trained these old workers for new jobs any quicker than you did it? A. May I have the first part of the question? (Question read.) A. No, sir. I stated to Mr. Becker that the

only time we were taking time on training was in those periods where to make a quick shift would disrupt the production and endanger the jobs of returning strikers who were at work."

On cross examination, Brainerd again testified as follows:

"Q. You made the statement this morning, Mr. Brainerd, as I recall it, and if I am wrong, you just correct me, that it was physically impossible to keep the plant going and break in strikers on new jobs? A. Any more rapidly than we did. Q. Is that your conclusion? A. Yes, very definitely."

Later on, on redirect, Brainerd testified as follows:

"Q. Now, just one other thing that I want to clear up, and that is: What is the difficulty about a man being on a job when he cannot turn out production? A. It affects everybody that is further along than he is. Q. How about people in his group? A. It affects them too. If it is a group operation it affects their earnings. We had that very definitely in one case. Q. Give us that one case, for example. A. Where one of the men, the question was whether he should be given an opportunity in the milling department and we acceded to Mr. Ingraham's request, and

If Brainerd's testimony is competent, credible and unimpeached, the Master, if he believed Brainerd, could rely upon his testimony as he did. Brainerd's testimony, thus relied on, met the prima facie case which the Board had made out.

The Board contended, in effect, that Brainerd's testimony is hearsay; that the company could have adduced, but did not adduce, better evidence through the testimony of Brainerd's subordinates who had first-hand knowledge of the facts relating to the cases of the employees in question; and that, therefore, Brainerd's secondhand testimony is entitled to no weight and cannot support the Master's findings. To that contention there are these answers:

(a) In proceedings before the Board, such hearsay testimony, where it is the kind "on which reasonable men are accustomed to rely in serious affairs," is admissible and may be the basis of valid findings and valid orders made by the Board; for "it is only convincing, not lawyers' evidence which is required," evidence "such as a reasonable mind might accept, though other like minds might not do so."[11]

The hearing before the Master, to be sure, concerned alleged violations not of the Board's order but of an order of this court; but our order was for the enforcement of the Board's order; it would be unreasonable to hold that the Board may rely on hearsay in formulating its order but that a Master appointed to consider alleged violations of our enforcing order may not.

(b) Brainerd was the personnel officer whose duty it was to supervise subordinates in charge of allocation of work. His hearsay testimony was not mere gossip.

(c) Nor is this a case like N.L.R.B. v. Cities Service Oil Co., 2 Cir., July 2, 1942, 129 F.2d 933, 937, where we held that, "in the circumstances," it was not reversible error for the Board to exclude certain hearsay testimony; there, as we noted, the Board's counsel admitted that the testimony should probably have been admitted but argued that the error was harmless; we agreed with that argument because the excluded testimony (1) was contrary to direct evidence which was in the record, (2) was cumulative of other testimony which was admitted, and (3) was virtually conceded by company's counsel at the hearing before the Board to have little significance.

The Board's statistical evidence and Brainerd's testimony created an issue of fact calling for a finding by the Master based on the weight of the evidence. Brainerd's testimony, if believed by the Master, was sufficient to outweigh the prima facie case made by the Board. It was not necessary for the company, in its effort to overcome that prima facie case, to produce the first-hand testimony of Brainerd's subordinates. The Board could have called them as witnesses to rebut Brainerd's testimony, but it did not choose to do so. The Master, consequently, had a right to rely on Brainerd's unimpeached testimony, given in the Master's presence, if the Master believed Brainerd. As the Master did believe that testimony and so relied, and as he made findings of fact accordingly, we cannot disregard those findings since we cannot say that they are clearly erroneous.

It is suggested that Brainerd's testimony is "stereotyped" and, therefore, entitled to little weight. But in many kinds of actions, defenses tend to fall into a few categories. Defendants in automobile collision cases,

---

agreement with Mr. Clarkson to do so. The man was in there for a period of a month. For two weeks his fellow workers, strikers, were raising Old Ned because their pay was cut, and I explained to them it was not our desire to put the man in, and if we could take the man out without causing any commotion we would make up for that, and the amount that they had lost due to this new worker proving inefficient, and we did that. Q. When you say their pay was cut, what was that due to? A. It was the group operation of which the entire amount of work had to come out and when it did not come out due to this worker being in there, they likewise lost a percentage of their normal earnings. Q. Slowed down the whole group? A. Slowed the entire group. Q. In other words, the group is measured by the speed of the slowest worker? A. Correct."

[11] I. A. of M. v. N. L. R. B., 71 App. D.C. 175, 110 F.2d 29, 35, affirmed 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50; N. L. R. B. v. Remington Rand, Inc., 2 Cir., 1938, 94 F.2d 862, 873, certiorari denied 304 U.S. 576, 58 S.Ct. 1046, 82 L. Ed. 1540; Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; N. L. R. B. v. Service Wood Heel Co., 1 Cir., 124 F.2d 470. See Section 10(b) of the National Labor Relations Act, 29 U.S.C.A. § 160(b); cf. Hearsay Evidence in Administrative Hearings, 1 Pike & Fischer, Administrative Law Service, 48e, 52-1.

for instance, often plead contributory negligence; the testimony on that issue in any one such suit is pretty much like that in every other; but courts, merely by calling such testimony "stereotyped" cannot justify ignoring it.

It is further suggested that if we sustain the Master on this issue, we will be going counter to what we said in our earlier opinion (97 F.2d 195, 197), as to reinstatement of employees: "If this involves disturbance of the company's business, it is no doubt unfortunate; but, having chosen to challenge the law, it must abide the loss." But that was far from saying that particular employees should be restored to their same jobs with such promptness that such restoration would result in a loss to the employees as a whole.

2. We shall now deal with the specific claims of the Board on behalf of various individual employees.

■ A number of these individual cases revolved about the question of whether the decree required that striking employees be reinstated to their exact old jobs. The "Remedy" provided that "such production and maintenance employees shall be reinstated to their former classifications. * *" The Master misinterpreted our decree in this respect. The decree was not satisfied merely by reinstatement to former classifications. Such interpretation is contrary to the clear intent of the decree, which was directed at a restoration of the status quo. The various details of the Board's "Remedy" were designed to this end, and not as a limitation on the broad sweep of the decree. Therefore, the provision for restoration of strikers to the same "classification" was to enable them to retain the same economic conditions as before the strike. That a return to a workman's former job was contemplated by the decree was further made manifest by the two opinions of this court in the prior course of this case, citing the Board's order.[12] In both these opinions, we referred to reinstatement to "former" or "old" jobs.

The respondent claims to have relied on a statement made by a representative of the Board, agreeing with respondent's interpretation of the decree. But the views of the Board's representatives were expressly stated to be purely personal and so cannot be held to be binding on the Board. It should be noted that, at the time of the conference with the Board's representatives, the matter was already before this court and respondent could easily have applied to the court for an interpretation.

■ Albert Ambrosia was reinstated in the same classification although in a different group which did the same work at the same amount of time and pay. Fifteen months later there were some lay-offs in his group due to a decrease in production which resulted in a cut in Ambrosia's pay. The Board claims that he should have been reinstated to his exact old job. The Master found that Ambrosia has been reinstated to his former classification and recommended that the claim be dismissed.

The Master's recommendation as to Ambrosia is rejected in view of his misinterpretation of our decree. We award Ambrosia $83.00 back pay for loss of wages, and order that he be reinstated to his exact old job in his original group.

Sigmund Piasecki, at the time of the strike was milling rear uppers at 59 cents an hour. He was reinstated on June 22, 1938 and did milling and bench work at 58 cents an hour and then milled rear cones at 63 cents an hour. He returned to his exact old job in October, 1938, following a request by the Board. Meanwhile that job had been held by old employees who had earned $53.00 more than he did during the period. The claim is that he should have been given his old job when reinstated or by July 15.

The Master found that he had been reinstated to a job at his former classification at a wage which gave him at least the same earning possibilities and recommended that the claim be dismissed. We reverse the Master's recommendation and allow Piasecki $53.00 back pay, which is the loss he sustained from the failure originally to reinstate him to his exact old job.

Foster, at the time of the strike, did the freeing-up job in the Riveting Department. He was reinstated on July 8, 1938, to a job in his classification in the same department at the same rate per hour. His old job was done by Savory who, from July 15 to October 15, had more hours of work and earned approximately $44.00 more although, after that time, Foster's hours increased and both received the same amount of time.

The Master found that Foster had been reinstated to a job in his classification and

[12] N. L. R. B. v. Remington Rand, Inc., 2 Cir., 1938, 94 F.2d 862, 871; Id., 2 Cir., 1938, 97 F.2d 195, 196.

dismissed the claim. We reverse the Master's findings and award $44.00 for loss of wages to Foster.

Mae Romegialli, an inspector of ribbon-spools, was reinstated July 7 to her classification at the same hourly rate. On August 29, she was returned to the spool job. Meanwhile her work had been done by a new employee who had earned $19.50 more than she during the same period.

The Master found that she had been properly reinstated to her classification. We reverse the Master's findings and award Romegialli $19.50 for loss of wages.

Ten cases involved a determination of whether the employees had received substantially equivalent employment elsewhere. The Master found as a fact that Hubner, Muskatallo and Whitemore had received such substantially equivalent employment, and were therefore not entitled to reinstatement. In accordance with the Master's recommendation, we dismiss the claims made on behalf of these three men.

The Master found as fact that Luciano Gioiella, Dumais, Geary, Myjack, Groeper and Bellmore had not received substantially equivalent employment. Accordingly we order reinstatement of these six employees where they have not already been reinstated and make the following awards for loss of wages: Luciano Gioiella, $131.00; William Dumais, $228.00; Patrick Geary, $224.64; Rudolf Myjack, $48.80; Max Groeper, $381.47; Joseph Bellmore, $132.40.

In the case of Stanley Kulas, the Master's finding was that Kulas had received substantially equivalent employment elsewhere. This finding is clearly erroneous, in view of the fact that the value of Kulas' wages was considerably diminished by the cost of commuting to his new job. His home was approximately one mile from the Middletown plant but he had to travel 32 miles daily to and from New Britain, Conn., where he found new employment. Kulas having already been reinstated, we think he should be made whole for the net pecuniary loss he incurred through respondent's failure properly and promptly to reinstate him, and we remand the matter to the Master for determination of such amount.

Reneson and Moore: These two cases, though not identical, present similar problems. The decree of the court imposed a positive duty on respondent to make offers of reinstatement to production and maintenance employees, subject to certain conditions. Clearly, such a duty, within the terms of the decree, was owed to Reneson and Moore.

A letter offering reinstatement was sent to Moore but he failed to appear for an interview and the company assumed that he rejected the offer. The letter was correctly addressed and duly mailed but Moore testified that he had never received it.

Reneson received a letter offering him reinstatement. He signified his desire for re-employment to the company which sent him a letter asking him to report to work at a subsequent date. Reneson denies having received this letter. Subsequently the Board took up the matter and Reneson was reinstated. The claim is for loss of wages from July 15 to February 19, 1939, when he was reinstated. The Master found that the letter was mailed to Reneson and that Reneson had never received it, "but the company acted in a normal way in sending its summons to return to work by mail."

It is well settled that, in ordinary intercourse, in the absence of conditioning circumstances, such as a custom of the trade, the risk of loss in communication is on the one who selects the means of communication. This is as it should be. The company here was subject to a positive duty. It failed to discharge that duty. That the failure was occasioned by a loss in the mails is no excuse, for the respondent selected the mails as its method of communication. It is common knowledge that, while the mails are customarily safe, letters occasionally are lost. Here, in discharging its duty, the respondent must bear the risk of any such failure on the part of the mails. It could just as well have selected a more certain means, e. g., registered letter with return receipt, thereby providing a check against any misadventure such as occurred in these two cases.

Accordingly, we award Reneson $347.15, and Moore, $826.00, their net loss in wages occasioned by respondent's failure properly and promptly to reinstate them in accordance with our decree.

Aligning Department: Weglowski and Harris were two aligners who were reinstated to jobs as regular aligners. The Board claims that they were not fully reinstated in that one of them should have had the job of Garde, repairman in the Department. Garde could not be removed as he was an employee hired before the

strike. It is also claimed that Weglowski and Harris were discriminated against in that they were not given a "touch-up" job, but this was a new classification of additional inspection for which they were probably not fitted without more training.

The Master found that Weglowski and Harris were duly reinstated and we affirm that finding.

Rullman and Haglund, Cone and Ginty were aligners who were discharged for incompetence; the Master's findings uphold the respondent and pursuant to his recommendation, we discharge the claim on behalf of these four men.

■ Assembly Department: Palumbo and Magnano worked in groups 2 and 2-A which had 26 employees between them. At the time of the strike, Palumbo was an inspector and was reinstated to his old job July 15, 1938. Magnano was a typesetter and was reinstated on June 27, 1938. The Board claims that, of the 26 new employees, eight or nine new workers were getting more work than these two men and that this was a result of respondent's policy of ignoring seniority in laying off employees during slack times.

The Master found no discrimination. Palumbo and Magnano got as many hours of work as the others. We affirm the Master's finding that Palumbo and Magnano had been fully reinstated.

■ Barry, at the time of the strike, was a carriage-fitter, working on regular and large carriages. When he was reinstated, the work on large carriages was being done by Tosto, who was an old employee. After two or three months, a complaint was made and Barry was given that work. In the meantime, Barry had been working on regular carriages but his time and pay were the same as though it had included working on large carriages. A new machine—Model 17—was being manufactured and Tosto was broken in on that job. The Board claims that this work should have gone to Barry. The Master found no showing of discrimination in the selection of Tosto for the Model 17 job. Tosto, in fact, had greater seniority than Barry. We therefore dismiss this claim.

■ Luciano Gioiella was reinstated to his old job and worked for one year and then was transferred to a sweeping job which involved some lifting. Several months later due to the fact that he was not physically suited to do the lifting, he was transferred to a sweeping job which involved cleaning lavatories in the Assembling Department at the same pay. Gioiella refused to accept this new job. The Board claims a discriminatory discharge. The Master found no discrimination and we affirm his finding in this respect.

■ John Gioiella, Wamester and Jacobson: These three workers were hired as "learners" a few days before the strike. Respondent had no place for learners on July 15 and, pursuant to the court's decree, placed them on the preferred list and offered them jobs several months later. The Board claimed that respondent should have reinstated them and given them jobs to which new employees succeeded after being learners. The Master found there was no discrimination. We disagree. There was no reason for not reinstating them. If strike-breakers were in a position to be put on assembly jobs after a short period of training, then these employees must have been. We order that Gioiella and Jacobson be reinstated, and award $40.41 to Gioiella and $2.47 to Jacobson for loss of wages. Wamester admitted that he suffered no loss, and therefore we affirm the Master's findings as to him.

■ At the time of the strike, Oehmen was working in the shift job in the Assembly Department in group 2. He had previously worked on the bell job and was reinstated to that job at the same pay. The man on the bell job was an old employee who had returned during the strike. The Board withdrew its claim for loss of wages but insisted that he should have been reinstated to his exact old job. The Master dismissed the claim on the ground that Oehmen had been reinstated to his old classification. While the Board's contention that Oehmen should have been returned to his exact old job is correct, inasmuch as there was no resultant damage to Oehmen, it is difficult to see that there was any discrimination. We affirm the Master's findings.

■ Final Inspection Department: Donohue, Emilio Romegialli and Grimm were final inspectors at the time of the strike. There was no vacancy in that department on July 15, 1938, and all of the then final inspectors were old employees. The three were placed on the preferential list and offered jobs at Elmira which they refused. In the fall of 1938, they were reinstated to their old jobs. Three of the final inspectors on July 15, 1938, while old em-

ployees, had had other jobs at the time of the strike. The Board claims that they should all have been removed and their jobs given to Donohue, Romegialli and Grimm.

Final inspectors worked their way up through the production line and were usually transferred to other jobs on the line when there was no inspecting for them to do. The right to work during the slack period on the line was thus an incident of the final inspector's job. Consequently, it is hard to see how they could be denied reinstatement as long as there was work being done on the line by individuals employed since May 26, 1936.

The Master adopted this view. He recommended that compensation be allowed for the difference between what these three workers would have earned as final inspectors and what they did in fact earn at other jobs.

We affirm the Master's recommendation that Donohue, Romegialli and Grimm be reinstated in the Assembly Line if there are no vacant final inspectorships. There is no data in the record whereby there can be a determination of the amounts due these employees as line workers, and we refer the matter to the Master for such determination.

■ Sub-Assembly Department: Jennie Myjack obtained a maternity leave four or five months before May 26, 1938. She was advised that, when she could return to work, her job would be available. She was not reinstated until February 15, 1939. Her old job meanwhile was done by a strikebreaker. The respondent's defense was that the employment relationship had terminated when she took her leave. There was testimony in the record that it was the company's policy to reinstate such employees when a job became available. The Master found that the employment relationship having been terminated at the time of the strike, the company was not required to reinstate her. Whether she retained the right to return to work by any arrangement with the company was a pure question of fact, and we affirm the Master's finding.

■ The Board also claims under this heading that the employees on the preferential list should have been given a chance to work on Model 17—a new machine which was not being made at the time of the strike. It was manufactured in Elmira except for the carriage which was made at Middletown.

We affirm the Master's finding that there was no discrimination here. This was a new mechanism requiring specialized workmen, and, besides, there were not sufficient jobs at Middletown on this model to make a dent in the preferential list.

■ Rebuilt Department: Antoinette Lombardi was not reinstated to her exact old job but rather to her former classification with pay which would have given her the same daily earnings. We affirm the Master's recommendation that the claim be dismissed.

■ Grinding Department: Zwyno, at the time of the strike, ran a foot-press on platen-rolls and spent some time on springs and tapes, a girl's job. The platen-roll job was moved to Elmira prior to July 15. He was offered a job at Elmira and refused. On July 15 a girl was working on springs and tapes, and the company's evidence indicates that no place was open for Zwyno on that date until October 1939, when he was returned to work and assigned to a job in the Raw Stores Department.

The Board claims that on July 15 there were three new male workers in the department and that Zwyno should have been reinstated to one of these jobs. The Master recommended that the claim be dismissed. We reverse the Master's finding as to Zwyno. He was certainly entitled to have one of the jobs of the new men who were retired four and ten days after July 15, 1938, and accordingly we award Zwyno $115, the net amount of his loss in wages.

Fortin, at the time of the strike, worked in the Turret Lathe Department and "did all other jobs and worked all over the place." The job was moved to Elmira and the Board claims that he should have been given one of the jobs held by the three new workers at the Middletown plant, referred to in Zwyno's case, supra.

The Master found no discrimination. We think that Fortin, like Zwyno, should have had one of the jobs of the new men. Thayer, a new man, should have been removed and Fortin, who had operated a turret-lathe like Thayer, substituted. We order that Fortin be paid his net loss to the date of his reinstatement to his old job, which sum the Board found to be $111.76.

■ Inspection Department: Loss, Maher and Champion, at the time of the strike, were assigned to inspect in the Type Action Department. They were reinstated after the strike. The claim is that, prior

935

to the strike, when they completed their work in the type-action department, they would be transferred to work in other departments. After the strike this policy was not followed in the case of these three employees, but was in others.

The Master found no discrimination. The testimony here is conflicting and we affirm the Master's findings.

■ Japan Department: Mastergeorge, at the time of the strike, had had the job of framing and paneling for one or two weeks, having previously been a learner. Because there was no opening for her, she was not reinstated on July 15. She was placed on the preferred list and offered an Elmira job, which she refused. The company's evidence is that there was no opening for her until August 22, 1938, at which time she was given a job in the type-action department. In March, 1939, there was an opening in the Japan Department and she was placed there. All the workers in the Japan Department, on March 15, were old employees, except Riggott, whose work was not the same as Mastergeorge's.

The Board claimed that Mastergeorge should have been reinstated on July 15 to Riggott's job or one of the jobs held by new employees. The Master found that there was no evidence that Mastergeorge could have performed any of these jobs and accordingly dismissed the claim. We affirm the Master's finding in this respect.

■ Kelley was not reinstated on July 15, 1938, although there was a job available. The company's doctor felt that he was a compensation risk although he did not report him physically unfit for work. The Master found that Kelley was undoubtedly fit for work and recommended that Kelley be allowed $250.00 for loss of wages resulting from failure to reinstate him by July 15, 1938. We adopt the Master's findings.

■ Carta and Murphy did hand-scraping of carriage-ends. Their job was supplanted by machinery run by newly hired girls. They were later put in the Rebuilt Department, assembling rebuilt machines. The claim is that they should have been returned to their old jobs even though they were now being performed by girls working at machines, and also they should have been assigned to jobs in the Rebuilt Department earlier, since the company recognized their ability to work in that department by giving them jobs there in August 1938.

The Master found that the work done by the machines was a different job and that there was no evidence to substantiate the claim to earlier reinstatement in the Rebuilt Department. This is purely a question of fact, and we adopt the Master's findings as our own.

■ Antonovitz and Whalen were reinstated in the Rebuilt Department for there was no work available in the Japan Department. The Master found no discrimination and recommended that the claims be dismissed. We affirm the Master's findings.

■ Milling Department: Mandeville, at the time of the strike, straightened carriage-ends in the rough. Four or five months previously he had spent part of his time straightening finished carriage-ends. On July 15, he was reinstated to the latter job. The rough carriage-ends job was being done by an old employee who had returned during the strike. The Master recommended that the claim be dismissed. There was plainly an attempt to comply with the decree here and a fair compliance in so far as Mandeville was reinstated to a job he had previously done. We affirm the Master's findings.

■ Casey's old job was not available as a full-time job on July 15 due to a cut in production. She was familiar with machine jobs in the department and was assigned to one. The Master found no discrimination and we accordingly dismiss the claim.

■ Raw Stores Department: Fields, at the time of the strike, worked in the stockroom and disbursed supplies. Dougherty, who worked with him, received supplies. They went on strike together but Dougherty joined the back-to-work movement during the strike. During the slack period after July 15, 1938, Dougherty worked more than Fields. The company alleged that it had to have a man receiving, regardless of slack. The Board claimed that Dougherty should have been laid off and Fields should have been given both jobs during the slack, and hence Fields was not properly reinstated. It cites as a precedent that, during the depression of 1929, Dougherty had been laid off and the two jobs done by Fields alone. The Master found no ground for a claim of discrimination, and we dismiss the claim.

■ Tool Department: Huber was restored to his exact old job. The Master

found, as a fact, that he did not have to share his work with the new employees and that there was no discrimination. We affirm the Master's findings.

■ Type-Action Department: Magnano, Scanlon and Benashski were not put back in their old jobs which were occupied by workers who returned to work during the strike and prior to July 15, 1938. The Master found no discrimination and we accept his findings.

■ Type Department: Perina Walsh was returned to a job in her old classification. The rate of pay was less than the old job, although the evidence was that she could have made the same amount if she had been able to get out production. An old employee who had returned to work prior to June 1, 1938, had her old job. She complained to the foreman and was returned to that job in October or November 1938. The Board claimed that she should have been returned to that job on July 15, 1938. The Master found no discrimination and we accordingly dismiss the claim.

■ Time-Clerks: Nineteen time-clerks were stationed in the various departments. The Board claims that they were production and maintenance employees and should, therefore, have been reinstated by July 15. They were not reinstated because respondent did not regard them as production and maintenance employees. Their duties were to record the time worked, to figure the amounts due and report to the accounting department. They also distributed tools and supplies to the men in the various departments in which they worked, unlike other clerks, they were carried on the payrolls of production and maintenance departments, their pay being charged to overhead. The Master found that these were not production and maintenance employees and hence not entitled to reinstatement. We think the Master's findings in this respect were clearly erroneous. To all intents and purposes, time-clerks working in a production and maintenance department, were members of that unit. They should, therefore, have been reinstated by July 15, 1938. Accordingly, we order that, where possible, they should now be reinstated, and the matter is referred to the Master for further testimony to determine the net loss in wages.

### III.

■ The respondent has contended, arguendo, that, even if it had failed precisely to comply with the court's decree in certain cases, such non-compliance was not purposeful, that its intentions were good and that accordingly we should not hold it in contempt. This contention is untenable. The question is whether any employees have suffered harm because of a violation of the decree; those who have should be made whole. This is so regardless of the subjective intent of respondent. And, even if it were true that, taken alone, the conduct of the company since the enforcement decree was entered was such that it could be said that its non-compliance was purely "technical," we could not, in judging that conduct, disregard the earlier history of this controversy—the fact that the company in the previous course of this dispute has been adjudged a violator of the National Labor Relations Act by the Board, and had attempted to fend off enforcement by this court of the Board's order with such persistence as to cause us, in our earlier opinion, to remark rather sharply upon it.

### IV.

The Board's order and the court's decree both stated with reasonable specificity those acts which respondent was to do affirmatively, and those which it was to refrain from doing. Respondent has violated the mandate of this court in the cases of the twenty-seven Elmira polishers, Albert Ambrosia, Sigmund Piasecki, Russell Foster, Mae Romegialli, Luciano Gioiella, William Dumais, Patrick Geary, Rudolf Myjack, Max Groeper, Joseph Bellmore, Stanley Kulas, Chester Reneson, James Moore, John Gioiella, Helen Jacobson, Florence Donohue, Emilio Romegialli, Fred Grimm, John Zwyno, Roland Fortin, Reginald Kelley and the nineteen time-clerks, and, accordingly, we find it in contempt. The contempt shall be purged by making the ordered restorations and by the payment of compensatory fines in the amounts indicated above, to remedy the losses of wages incurred as a result of the contemptuous acts.

The Master's report is, as we have indicated, an interim report, covering only two of respondent's plants. The balance of the case, as to respondent's other plants, should proceed before him with expedition.

If now, or during future hearings before the Master, important differences arise between the parties as to the meaning of our orders herein, it will be desirable if the parties promptly come before this court for interpretations of those orders.

The costs, including the Master's compensation, witnesses' and stenographers' fees, are to be divided between the parties, two-thirds to be borne by respondent and one-third by the Board. We award the Master a fee of $6,000. Respondent is to make available to the National Labor Relations Board its personnel, payroll and social security records for its Ilion, Syracuse and Elmira, New York, plants for the periods from May 1 to May 26, 1936, and June 1, 1938 to the date of this order, for purposes of analysis to determine the full extent, if any, of respondent's failure to comply at those plants. Finally, we order respondent to post notices for a period of sixty consecutive days throughout its plant, advising its employees that it has been held in contempt.

Let the Board submit an order in accordance with the foregoing, upon ten days' notice to respondent.

CLARK, Circuit Judge (concurring in the result).

With some hesitation I concur in the result reached herein. It represents a more forthright vindication of the legislative policy as to labor relations than do the report and recommendations of the master; and since this court (in proceedings in which I did not participate) has referred the issues to a master, perhaps it is unwise, or at least unseemly, to reverse him more than is done herein. I am sure, however, that the "clearly erroneous" rule—applied in the district court to findings of fact of a district court master sitting in substance as a court of first instance on issues essentially judicial—has no proper application to this last and most delicate task of all in supporting the presently settled public policy (not to speak of our own dignity) in this most difficult and troubled socio-economic field. I have already commented upon the anomaly of taking the finally decisive part of the proceeding out of the expert process created for it and committing it to lawyer friends of the court, who, however distinguished, are not specially trained for the task, are necessarily un-familiar with the usually long drawn out past history of the particular case, and not occasionally are disposed by training and background to doubt the public policy itself. N. L. R. B. v. Giannasca, 2 Cir., 119 F.2d 756, 759, 135 A.L.R. 560; Corning Glass Works v. N. L. R. B., 2 Cir., 129 F.2d 967. Every case I see but shows me the more that this course is not merely extraordinarily expensive of time and money, but is stultifying to us in carrying out our responsibilities under the law, as it must be unsatisfactory to the master himself. It is no reproach to the distinguished lawyer who has already worked most faithfully on this case for more than two years at our behest to point out this anomaly and to state that the fault is in the method, not the individuals trying to work under it. The Board itself should be the agency to take and report the evidence to us as to the observance of our decrees; and we should require this duty of it.[1] But in no event are we justified in repudiating our own responsibility to the extent of committing adjudication of the important facts to a nominee of ours just as though he were a court of first instance. At most he should be considered only our adviser; the duty of adjudication must remain with us.

If we had permitted ourselves the more extensive review which I think is our duty, we might well have made different findings, or at least have required further testimony, as to respondent's failure or delay in rehiring so large a number of its former employees. We do find error in the master's disregard of the Board's chart showing discrimination against these men; but then we rather dissipate the effect of our ruling by holding this persuasive proof rebutted by the stereotyped answer[2] of Brainerd, the personnel manager, that the men could not be quickly retrained for respondent's work, so much had it changed its character in the intervening two or three months, and that their reinstatement would disrupt production. We had already said, however, at page 197 of 97 F.2d: "If this involves disturbance of the company's business, it is no doubt unfortunate; but, having chosen

---

[1] That the Board was reluctant to act in another case under different circumstances is not decisive here. Moreover, I conceive it to be a matter in which the Board owes an inescapable duty both to the court and to the legislature which framed the policy. The Board has facilities through its trial examiners of taking the testimony promptly and expedi-tiously. This is not a matter where its findings are binding on us; indeed, if we feared the effect upon us of a report of the examiner or of the Board, we could dispense with either or both and order only the evidence to be reported.

[2] Which, of course, suggests lack of careful consideration of each separate case.

to challenge the law, it must abide the loss." It does not seem to me that the Board has any obligation to hunt up respondent's foremen for more direct evidence on this issue; that suggestion implies altogether too heavy a burden of proof upon the Board. In the light of the evidence actually presented, I believe an award of back pay apportioned among the workmen as in F. W. Woolworth Co. v. N. L. R. B., 2 Cir., 121 F.2d 658, 662, would have been justified, and should have preferred that result, rather than such close adherence to the master's report as is had.